463 So.2d 1378 (1985)
Joseph C. GAUTREAU, Plaintiff-Appellant,
v.
SOUTHERN MILK SALES, INC., Defendant-Appellee.
No. 84-95.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1985.
Rehearing Denied March 8, 1985.
*1380 Theall & Fontana, Gary Theall, Abbeville, for plaintiff-appellant.
Wayne Shullaw, Broadhurst, Brook, Mangham, Hardy & Reed, Lafayette, for defendant-appellee.
Before DOMENGEAUX, STOKER and KING, JJ.
STOKER, Judge.
Joseph C. Gautreau, a dairy farmer, brought suit against Southern Milk Sales, Inc., a milk marketing cooperative, seeking to enjoin it from withholding money from him and seeking to recover money already withheld. Southern Milk reconvened seeking damages in the amount of $6,168.92 for losses sustained by receiving contaminated milk from Mr. Gautreau, less amounts already withheld from him.
The trial court granted an injunction prohibiting Southern Milk from withholding any further sums from amounts due Mr. Gautreau. Mr. Gautreau subsequently filed supplemental and amending petitions seeking damages resulting from Southern Milk's wrongful retention of his funds. The trial court dismissed Mr. Gautreau's claims and gave judgment in favor of Southern Milk on the reconventional demand in the amount of $3,598.52. We affirm the judgment in favor of Southern Milk for damages, but reverse the judgment dismissing Mr. Gautreau's damage claim.
The substantial issues are:
1) Whether Mr. Gautreau should be liable to Southern Milk for its losses sustained from receiving contaminated milk, and;
2) Whether Southern Milk should be liable to Mr. Gautreau for wrongfully withholding funds from him.

FACTS
Southern Milk is a milk marketing cooperative which collects milk from a number of dairy farmers, including Mr. Gautreau. It sells the milk on behalf of the farmers and sends each farmer his share of the purchase price. The arrangements between Southern Milk and the individual farmer are set out in a contract titled "Membership and Marketing Agreement." Such an agreement was signed by Mr. Gautreau on November 15, 1976. A portion of that agreement provides:
"7. MEMBER [Mr. Gautreau] agrees to conform to and observe the By-Laws of the ASSOCIATION [Southern Milk], which are incorporated by reference and hereby made a part of this Agreement, as they are now or may be changed through amendments from time to time, and herein and hereby agrees that the Board of Directors of the ASSOCIATION may prescribe rules and regulations relative to marketing plans, handling, delivering, storage, shipment, standards or grades of milk delivered by MEMBER and other members in compliance with said By-Laws, and MEMBER agrees to be bound by and comply with such rules and regulations. The sole intended purpose of ASSOCIATION is to market MEMBERS raw milk."
Milk intended for human consumption is required to be tested for the presence of antibiotics or other inhibitors. Prior to July of 1980 the Bacillus Subtilis Disc Assay (old test) was used to test for the presence of antibiotics. The old test could detect the presence of .05 of a unit of penicillin per milliliter of milk. In July of 1980 a new test came into use called the Bacillus Stearothermophilus Disc Assay. The new test can detect the presence of .005 of a unit of penicillin per milliliter.
*1381 Dr. Larry J. Maturin, Director of Divisional Laboratory Services for the State of Louisiana, testified regarding the use of the old and new tests. According to Dr. Maturin, the primary reason for switching to the new test was speed. The new test can be conducted within four hours, whereas the old test required 12 to 14 hours. Dr. Maturin also testified that the new test is highly accurate, and is ten times more sensitive than the old test.
On September 5, 1980, the Board of Directors of Southern Milk adopted a policy concerning losses incurred as a result of receiving milk which produced a positive result to the new test for the presence of antibiotics. The members of the Southern Milk cooperative were notified of the new policy by letter dated October 21, 1980. That letter reads in part:
"As a result of the increased incidence of positive tests, Southern Milk Sales, Inc. has adopted the following policy in handling antibiotic contaminated milk: Any producer whose milk exhibits a positive test for the presence of antibiotics and/or inhibitors shall be liable for all losses incurred in disposing of the contaminated milk. The test detection procedure shall be the approved method prescribed by the United States Public Health Milk Ordinance and Code."
On Friday, April 23, 1982, milk Mr. Gautreau had collected on Wednesday and Thursday was picked up. In accordance with procedure, the truck driver took individual samples of Mr. Gautreau's milk, as he did with the other farmers whose milk he picked up. A sample of milk from the truck which picked up Mr. Gautreau's milk, along with that of eight other farmers, gave a positive result to the new test for antibiotics conducted by an employee of Southern Milk. Samples from all the farmers whose milk was mixed in that truckload were tested, and only Mr. Gautreau's milk gave a positive result. That truckload of milk containing 37,854 pounds, along with an additional 9,394 pounds with which it had been commingled in the silo, was transported at the expense of Southern Milk and dumped at a hog farm. Mr. Gautreau was notified on Saturday by an employee of Southern Milk that his load of milk had tested positive.
Southern Milk sent Mr. Gautreau an invoice dated April 27, 1982, billing him for the loss of 47,248 pounds of milk at a cost of $5,919.92, plus the additional cost of $249 for hauling the contaminated milk to a hog farm. The invoice indicated that the damages would be payable in 12 monthly installments. Accordingly, Southern Milk withheld $514.08 from Mr. Gautreau's check on May 13, 1982, for his share of the purchase price of the milk. Similar withholdings were made for the following four months, despite Mr. Gautreau's protest that he did not owe the money.
On November 8, 1982, the trial court granted Mr. Gautreau's request for a preliminary injunction prohibiting Southern Milk from continuing to withhold funds from his check. Mr. Gautreau's written demand to Southern Milk that amounts already withheld be returned to him was denied, and he filed subsequent amending petitions seeking damages for this wrongful withholding.

LIABILITY FOR CONTAMINATED MILK
Mr. Gautreau first argues that the new test used to test for the presence of antibiotics in his milk is unreliable and overly sensitive. While it is true that the new test is more sensitive than the old test, Dr. Maturin testified that milk would have to pass the standard of the new test before being placed on the shelves for public consumption. According to Dr. Maturin, the new test was approved for use by the Interstate Milk Shippers Conference in conjunction with the Food and Drug Administration.
After trial of this matter, Mr. Gautreau moved to reopen the evidence in order to show that Southern Milk had begun to use a test less sensitive than the new test which caused this dispute. The trial court, in considering the motion and the new evidence, stated, "The evidence has no relevancy to the conditions and terms which were binding upon the parties at the time *1382 this dispute arose." We agree with this evaluation. The testimony at trial shows that the new test previously used by Southern Milk was accepted procedure at the time even though that procedure may subsequently have been improved.
In arguing that the new test is unreliable, Mr. Gautreau testified regarding the results of tests he had conducted on samples of milk taken after this incident. According to Mr. Gautreau, milk collected on Friday and Saturday morning gave a negative result to the new test on Saturday, and the same milk gave a positive result on Monday. Milk collected on Saturday night and Sunday morning and placed in the same tank as that picked up by Southern Milk on Friday gave a negative result to the test. These samples were collected by Mr. Gautreau and taken to Borden by one of his children for testing. Only Mr. Gautreau's testimony was introduced on this matter; no reports or testimony from Borden employees was introduced.
Apparently the trial judge considered the evidence and testimony presented at trial and found that the new test was accurate, conducted properly, and reliable. We cannot say that such a conclusion is clearly wrong.
Mr. Gautreau also asserts that Southern Milk could not impose liability on him by merely adopting a resolution. Mr. Gautreau claims that the policy imposing liability violates the following provisions of his agreement with Southern Milk:
"6. MEMBER hereby authorizes ASSOCIATION to deduct the sum of twenty-cents per hundredweight of milk marketed for MEMBER by ASSOCIATION as a charge for marketing services. ASSOCIATION hereby covenants and agrees that the amount of this deduction shall not be increased except by a majority vote of MEMBERS attending a meeting called for the purpose of voting upon such a change.
* * * * * *
"8. This Agreement is one of a series depending for its force and effect on the adherence of each and all the contracting parties to each and all of said Agreements. MEMBER hereby specifically agrees that ASSOCIATION shall have all the rights and remedies provided by law and by the By-Laws of ASSOCIATION in the event of a breach or threatened breach by MEMBER of this Agreement."
In our opinion, Provision No. 6 does not apply to the damages sought by Southern Milk in this action. That provision concerns only a deduction made for charges for marketing services. The deduction made by Southern Milk is not made as a charge for marketing services, but was made pursuant to its approved policy establishing the rights and liabilities of the parties in the event damages occurred from Southern Milk having received contaminated milk.
We do not find that the terms of Provision No. 8 prevent Southern Milk from adopting a policy such as that in question here. Although we do not have the bylaws of the Association before us, we will assume for purposes of this discussion that there is nothing in the bylaws similar to the provisions in the policy establishing liability by a member giving contaminated milk. Southern Milk takes the position that the policy is a regulation adopted pursuant to Provision No. 7 previously quoted. There is no allegation that the policy was not adopted in compliance with the bylaws, and we have no reason to believe that this is the case. As adopted, the policy became a part of the contract between Mr. Gautreau and Southern Milk.
We note that Mr. Gautreau had an opportunity to withdraw from the agreement with Southern Milk after the policy was adopted and prior to the time that the liability occurred. Although Mr. Gautreau claimed that he signed the agreement under duress and that he could not sell his milk to anyone other than Southern Milk, there is no proof of these allegations in the record. The contract between Mr. Gautreau and Southern Milk is valid and binding.
*1383 The invoices and other documents introduced into evidence are sufficient to establish the losses sustained by Southern Milk. Contrary to Mr. Gautreau's claim, we do not think Southern Milk acted in undue haste in commingling the milk.
The conclusion that Mr. Gautreau may be held responsible for damages resulting from the contaminated milk does not necessarily lead to the conclusion that Southern Milk could withhold those funds from Mr. Gautreau under his protest. We now consider that question.

LIABILITY FOR WITHHOLDING FUNDS
Mr. Gautreau argues that in withholding his funds Southern Milk unlawfully deprived him of his property without due process of law, engaged in an unfair trade practice under Louisiana law, and unlawfully converted his funds for its own use. Although it has now been determined that Mr. Gautreau is liable for the damages sought by Southern Milk, Southern Milk was not entitled to withhold those unliquidated damages from Mr. Gautreau. Because we find that Southern Milk's retention of the funds in question constitutes tortious conversion, we do not reach the question of whether this action also constituted a taking of Mr. Gautreau's property without due process of law or an unfair trade practice.
Conversion is a wrongful act of dominion exerted over another's property in denial of or inconsistent with his rights. Central Fidelity Bank v. Gray, 422 So.2d 670 (La.App. 3d Cir.1982); Lincecum v. Smith, 287 So.2d 625 (La.App. 3d Cir.1973), writ refused, 290 So.2d 904 (La.1974). In this case Southern Milk became guilty of conversion upon its failure to release funds admittedly due to Mr. Gautreau. Southern Milk's contention that it was entitled to withhold the funds pursuant to its policy establishing the liability of Mr. Gautreau is without merit. There is nothing in the contract or in any other documents before the court giving Southern Milk the right to make such a withholding from money due Mr. Gautreau. Although liability for damages may be established between the parties to a contract, such an agreement does not give the party claiming damages the right to withhold that amount without legal authority when it is disputed. The policy approved pursuant to the contract gives Southern Milk only a legally enforceable claim for damages.
Southern Milk also takes the position that it was entitled to withhold funds from Mr. Gautreau pursuant to the provisions of LSA-C.C. arts. 2207 and 2208 concerning compensation between debtors. In order for this principle of compensation to apply the debts must be equally liquidated and demandable; a contested debt is not a liquidated one and cannot be used as a basis for compensation. Hartley v. Hartley, 349 So.2d 1258 (La.1977). Just as a secured creditor may not seize property without legal process, Southern Milk was not entitled to withhold sums due on an unliquidated claim.
The damages Mr. Gautreau suffered from the withholding do not appear extensive. For five months he did not receive the full amount due him. The check stubs show that for two of those months a payment normally sent to one of Mr. Gautreau's creditors on his behalf was less than the required amount. According to Mr. Gautreau, payment of the lesser amount has hurt his credit rating. He also testified that because he did not have use of the withheld funds at his disposal he had to go to other creditors and explain his late payments.
In view of our conclusion that Mr. Gautreau is liable for the amounts sought by Southern Milk, we find that he is not entitled to reimbursement of the withheld funds. However, we do find that he is entitled to $1,000 in general damages for the wrongful withholding.
For the above reasons, the judgment in favor of Southern Milk in the amount of $3,598.52 is affirmed. The judgment dismissing Mr. Gautreau's claim for damages is reversed, and it is hereby ordered, adjudged and decreed that there be judgment in favor of Mr. Joseph C. Gautreau and *1384 against Southern Milk Sales, Inc. in the amount of $1,000. Costs at trial and on appeal are to be assessed equally between plaintiff and defendant.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.