**UNITED STATES of America, Plaintiff,**

v.

**HIBERNIA NATIONAL BANK, Defendant–Third Party Plaintiff–Appellant–Cross Appellee,**

v.

**Joseph M. RAULT, Jr., Third Party Defendant–Appellee–Cross Appellant.**

**No. 88–3406.**

United States Court of Appeals, Fifth Circuit.

Sept. 8, 1989.

Clarence F. Favret, Favret, Favret, Damarest & Russo, New Orleans, La., for defendant-third party plaintiff-appellant-cross-appellee.

John R. Martzell, Jane C. Ettinger, Joseph Rault, Jr., New Orleans, La., for third party defendant-appellee-cross-appellant.

Before ALDISERT,* REAVLEY, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Both parties appeal from the district court's order on remand finding Joseph Rault, Jr. personally liable to Hibernia National Bank for $139,138.18, part of a sum that Hibernia erroneously credited to Rault Petroleum Corporation's account. Rault disputes liability, arguing that the trial court erred by finding that he had a duty to escrow the remaining overcredit funds once he discovered the error. Hibernia contends that the district court erred by basing its damage award on the funds remaining in the account on March 31, 1989. For reasons stated below, we affirm the district court's finding of liability, but remand for redetermination of damages.

### I

The United States Army contracted with Rault Petroleum Corporation, owner of the Rault Center Hotel, to provide lodging for new Army recruits. The Army subsequently issued a Treasury check to the hotel which contained two different figures. The correct amount, $24,844.50, was typed in the body of the check. The figure entered on the right hand side of the check, however, was $244,844.50. In the first appeal, we detailed the process by which deposit of the check with Hibernia resulted in a $220,000 overcredit to RPC's account. *United States v. Hibernia National Bank*, 841 F.2d 592, 593–94 (5th Cir.1988). Despite notification by RPC employees, Hibernia never corrected the error.

RPC gradually spent the overcredit funds between December 1982 and September 1983. The district court found that Rault, the sole shareholder and president of RPC, "failed to advise Hibernia of the discrepancy ... though he was regularly advised and, indeed, knew of the excess balance in the account certainly as early as March 4, 1983." The balance in the account on March 31, 1983 was $139,138.18. By August 1983, the amount on deposit was $102,475.87. The following month, Rault withdrew $100,000 to purchase a certificate of deposit.

The Army later became aware of the overpayment, and demanded repayment of the $220,000 from the hotel and Hibernia. Both parties refused these demands. The United States brought suit against Hibernia and RPC for conversion of the overpayment. Hibernia filed a cross-claim against RPC for fraud and a third-party claim against Joseph Rault, alleging that he fraudulently converted the proceeds of the Treasury check. RPC was later placed in involuntary bankruptcy, and all proceedings against the corporation were stayed.

The trial court found Hibernia liable to the United States for the $220,000 overpayment, and rendered judgment for Hibernia against Rault for $110,000. Both Hibernia and Rault appealed. In the first appeal, we affirmed the judgment for the United States against Hibernia. However, we vacated the judgment against Rault and remanded for further explanation of the basis for Rault's liability. On remand, the trial court found that Rault had a personal duty to escrow the overcredit funds for Hibernia "when [he] first had a clear picture of the funds in the account." The court then reconsidered its earlier award of $110,000, and entered judgment in the amount of $139,138.18, the balance on deposit as of March 31, 1983.

### II

Having examined the district court's findings, we are persuaded that it relied on

* Circuit Judge of the Third Circuit, sitting by designation.

both theories of fraud and conversion. In its original opinion, the district court found that Rault knew of the $220,000 overpayment, that he failed to escrow or cause his employees to escrow the funds, but that he instead took actions to deplete the account, causing a loss to Hibernia. In its original conclusions of law, the district court stated, "A corporate officer's failure to escrow monies which he knows were paid to the corporation by mistake is a non-dischargeable conversion, constituting fraud. *Lawrence Freight Lines, Inc. v. Transport Clearings–Midwest, Inc.*, 16 B.R. 890 (B.C.W.D.Missouri 1979)." On remand, the district court quoted our prior opinion where we suggested as a possible theory "that when Rault first had a clear picture of the funds in the account; [sic] he had a personal duty to escrow these funds for the bank." *See Hibernia*, 841 F.2d at 597.

Since we believe the judgment against Rault can be sustained solely on the basis that he converted the money, we affirm the holding of personal liability on that ground. "A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods depriving him of the possession, permanently or for an indefinite time, is a conversion." *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 760 (La.1985); *Mills v. Martin*, 506 So.2d 117, 120 (La.Ct.App.), *writ den'd*, 508 So.2d 69 (La.1987). In this case, Rault depleted the funds Hibernia erroneously credited to the account, personally signing each check drawn on the account after March 4. The act of withdrawing these funds and using them for various purposes constitutes an act of dominion in derogation of Hibernia's possessory rights.

■ Rault defends primarily on the ground that he had no intent to defraud Hibernia. Thus, he challenges the district court's finding of fraud as clearly erroneous, and challenges also the district court's failure to consider evidence designed to show his intent. Of course, an intent to defraud is not required to prove conversion:

The intent required for a conversion is not necessarily that of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. A mistake of law or fact is no defense. Persons deal with the chattels or exercise acts of ownership over them at their peril, and must take the risk that there is no lawful justification for their acts.

*Louisiana State Bar Ass'n v. Hinrichs*, 486 So.2d 116, 121 (La.1986). Rault does not deny that he intended to take control over the erroneously credited funds. It is plain then that Rault Petroleum Corporation was guilty of conversion.

■ Nevertheless, Rault asserts that his status as a corporate officer offers him protection against personal liability in the absence of conscious wrongdoing. It has long been established in Louisiana that a corporate officer may be personally liable for conversion committed on behalf of the corporation. In *Bluefields S.S. Co. v. Lala Ferreras Cangelosi S.S. Co.*, 63 So. 96, 99 (La.1913), a corporate president used funds belonging to another company to pay corporate creditors, including himself. The Louisiana Supreme Court held that "[t]here was a clear diversion of the property and funds of the plaintiff company by the defendant company and its president; and they are both bound therefor." *Id.* Other Louisiana cases, though not dealing specifically with corporate officers, have recognized that "one who acts with another in keeping property from its rightful owner is guilty of conversion, and the fact that he acted as agent is no excuse." *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 464 So.2d 930, 935 (La.Ct.App.), *aff'd in part, rev'd in part on other grounds*, 475 So.2d 756 (La.1985); *Mauboules v. Broussard Rice Mills*, 379 So.2d 1196, 1197–98 (La.Ct.App.), *writ den'd*, 381 So.2d 1234 (La.1980); *Edwards v. Max Thieme Chevrolet*, 191 So. 569, 571–72 (La.Ct.App.1939). These cases do not appear to treat the idea that an agent who converts property for a principal may escape liability on the ground that he was not consciously doing wrong.

We began by declining to decide the issue at its broadest reach. Whether under Louisiana law a corporate officer's intent is never relevant to his personal liability for converting another's property, we need not face. Rather, we decide only that Louisiana offers Rault no defense for his acts, accepting the intent he claims. Rault argues that he thought this $220,000 belonged to the Army rather than to Hibernia; that in spending the funds he exercised a self-help setoff against claims the corporation had asserted against the Army. These claims originally rested on damage caused by recruits staying in the hotel. On May 27, 1983, the Army terminated the contract with RPC based on the hotel's alleged "default." After that date, RPC also asserted claims against the Army for prematurely terminating the contract. The Army never admitted its responsibility for the damages asserted by RPC, and the parties are currently involved in litigation before the Army's Board of Contract Appeals.

Rault's claimed intent rested, he asserts, on a mistake of fact as to ownership of the overcredited funds. However, it also involved a mistake of law concerning RPC's right to use the funds as a setoff. In *Gautreau v. Southern Milk Sales, Inc.,* 463 So.2d 1378 (La.Ct.App.1985), a milk marketing cooperative withheld portions of payments due under a contract with a supplier on the basis of the cooperative's claim that the supplier had previously furnished contaminated milk. The court determined that "a contested debt is not a liquidated one and cannot be used as a basis for compensation." *Id.* at 1383. Therefore, the purchaser "was not entitled to withhold sums due on an unliquidated claim." *Id.* Failure to release the funds constituted a conversion of those funds. *Id.*

In this case, RPC's contested claims against the Army were unliquidated. Thus, even taking the facts as Rault allegedly believed them to be, his acts would have constituted conversion under Louisiana law.

It bears emphasis that we deal here with more than a failure to pay over money owed to another in a setoff attempt that ultimately fails legal muster, the situation presented in *Gautreau.* Rault acted affirmatively in spending the overcredit funds. He did not simply withhold payment. He personally put the funds beyond the reach of the true owner. We conclude that under Louisiana law, under these circumstances, an individual cannot escape personal liability because he was a corporate officer.

*Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.,* 783 F.2d 480 (5th Cir. 1986), does not require a different result. In that case, we found that a corporate president was not liable for a corporation's conversion of funds held in trust pursuant to a floor plan method of financing automobile inventory. While we found liability for funds admittedly converted to the official's personal use, we did not hold the officer liable for the entire corporate debt. We cited the basic principle of Louisiana law that a corporate officer "is not personally liable for the tortious acts of the corporation in the absence of his own fraud, malfeasance, or other wrongdoing." *Id.* at 484. The officer liability under *Chrysler Credit Corp.* rested on the personal participation of the corporate officer. We held that he could not be held liable for the debt absent evidence that he personally directed the corporation's acts of conversion. In our case, by contrast, Rault spent the money mistakenly paid to the company by personally signing every check after March 4, knowing that the money he was spending had been paid to him by mistake.

Rault challenges the district court's finding that he personally benefitted from the converted funds as clearly erroneous. We do not rest our decision on this basis, because the record leaves us uncertain whether the district court held that all of the funds in the account were diverted to Rault's personal benefit.

Rault also contends that though he knew of the overcredit, he could not be sure on March 4 which of the remaining funds were due to the overcredit and which belonged to RPC. He asserts that funds from other sources had been added to the

account and commingled with the overcredit. Presumably, however, the corporation spent funds it had a right to spend before dipping into the overcredit. Thus, when the account balance fell below $220,000, the remaining funds were those belonging to Hibernia. When Rault took control of the account on March 4, it was at its lowest balance since the overcredit. Any money RPC had deposited in the account prior to that date had been used.

■ The "lack of consent by the owner or possessor is a prerequisite" to a conversion action. *LaRue v. Crown Zellerbach Corp.*, 512 So.2d 862, 864 (La.Ct.App.), *writ den'd*, 514 So.2d 1176 (La.1987). Arguably, in this case, the bank consented to Rault's withdrawal of the overcredited funds. Not only did the bank credit the money to RPC's account, but it honored the checks Rault wrote depleting the funds. However, as Professors Prosser and Keeton have said:

> A plaintiff cannot ordinarily be regarded as actually consenting to the defendant's conduct if the plaintiff assented to the conduct while mistaken about the nature and quality of the invasion intended by the defendant. Likewise, an overt manifestation of assent or willingness would not be effective apparent consent if the defendant knew, or probably if he ought to have known in the exercise of reasonable care, that the plaintiff was mistaken as to the nature and quality of the invasion intended.... The decisions in this area have involved assent induced by fraud, in the sense that the defendant was either aware of the plaintiff's mistake or ignorance and failed to disclose the truth, or the defendant induced the mistake with representation which he knew was false.

Prosser & Keeton, *Prosser and Keeton on Torts* § 18, at 119–20 (5th ed. 1984). We believe this exception to the consent defense applies here. While we do not say that Rault necessarily had an intent to defraud the bank, a district court finding he contests, it is nevertheless manifest that Rault knew that both Hibernia and the Army had made a mistake. Rault took advantage of the mistake by depleting the funds. While Rault asserts he never misrepresented anything, his act of writing checks on the account implicitly represented RPC's right to use the funds, a representation that was false under Louisiana law, even if we accept Rault's explanation of his intent. That RPC employees had earlier informed the bank of the overcredit did not change the fact that Rault misrepresented RPC's right to the funds at the time he withdrew them.

### III

■ Hibernia's sole contention on appeal is that the trial court erred by basing its award on the overcredit funds remaining in the account on March 31, 1983. Hibernia contends that the district court's own findings and the undisputed testimony at trial demonstrate that Rault knew of the overcredit on March 4, 1983. Thus, Hibernia argues that its award should be based on the overcredit funds remaining in the account on March 4, 1983, and asks us to modify its award to reflect this error.

On remand, the trial court gave the following explanation of its original award and its subsequent decision to increase that amount:

> The unusual circumstances of this case caused me to limit Rault's personal exposure to that point in time when there could be no doubt that Rault clearly and obviously knew that he had a clear and present duty to escrow the remaining funds for the bank and calculatedly and wantonly ignored that duty.
>
> * * * As I addressed this, giving Rault the benefit of the doubt in all respects, I concluded that the best and fairest determination was that the point was reached at the time when the fund level was $110,000.
>
> On reflection and on reconsidering the findings, I feel obliged to adjust that figure to $139,138.18, the balance on deposit as of March 31, 1983.

The trial court gave no reason for basing the award on the balance remaining in the account on March 31, 1983, and we find nothing in the record to support that decision.

While Rault may have discovered the error earlier, he undoubtedly knew of the overcredit by March 4, 1983. Rault admitted as much at trial since that was the date of the final report by RPC auditors highlighting the error. That same day, Rault required two fired employees to sign "termination statements" acknowledging the $220,000 overpayment. James Peterson, an employee, testified that Rault knew of the overpayment on March 3 or 4, 1983. Indeed, in its initial findings of fact, the court found that:

> 12. Joseph Rault, Jr. had knowledge of the source of the $220,000.00 credit and was aware that it was due to an overpayment on the Treasury check. He failed to advise Hibernia of the discrepancy in the 1111 Operations Account though he was regularly advised and, indeed, *knew of the excess balance in the account certainly as early as March 4, 1983.*

Based on the trial court's earlier findings and the undisputed evidence at trial, we conclude that the trial court erred by basing the damage award on the balance remaining in the account on March 31, 1983. The court should have based the award on the funds converted by Rault after he learned of the overcredit. This task is made easier by Rault's admission that he was the only person to withdraw funds after March 4.

On the other hand, Rault argues that he should not be personally responsible for checks still outstanding when he took control of the account. We agree. It is impossible from this record to determine which checks cleared after March 4 but had actually been sent out before that date. Thus, on remand, the district court should determine the amount of funds which were depleted by Rault after he learned of the overcredit, being careful to exclude checks still outstanding at that time.

AFFIRMED in part, VACATED in part, and REMANDED.