**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 00-31054
No. 00-31187

TUBOS DE ACERO DE MEXICO, SA,

Plaintiff-Appellant-Cross-Appellee,

versus

AMERICAN INTERNATIONAL INVESTMENT CORP., INC.,

Defendant-Appellee-Cross-Appellant,

GEORGE SFEIR,

Defendant-Appellee.

TUBOS DE ACERO DE MEXICO, SA,

Plaintiff-Appellant,

versus

AMERICAN INTERNATIONAL INVESTMENT CORP., INC;
GEORGE SFEIR

Defendants-Appellees.

Appeals from the United States District Court
for the Western District of Louisiana

June 10, 2002

Before BARKSDALE and STEWART, Circuit Judges, and DUVAL, District Judge.[*]

CARL E. STEWART, Circuit Judge:

In this consolidated appeal, Tubos de Acero de Mexico, S.A. (TAMSA) seeks reversal of the district court's order granting summary judgment for George Sfeir ("Sfeir") on its fraud and conversion claims against him personally. TAMSA also appeals the denial of its motion for summary judgment on American International Investment Corp., Inc.'s ("American") unfair trade practices and trade secrets counterclaims. American cross-appeals the district court's order granting summary judgment for TAMSA on its counterclaims for breach of contract and punitive damages. For the reasons that follow, we affirm the decision of the district court in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a commercial dispute between TAMSA and American and its vice president and chief executive officer, Sfeir, arising from a lease of ultrasonic testing pipe inspection equipment ("UT unit"). TAMSA is a Mexican corporation engaged in the business of manufacturing and selling steel pipe for various applications in the offshore petrochemical industry. As part of its quality control program, TAMSA uses UT units to test the manufactured pipe at its manufacturing plant in Veracruz, Mexico. American is a Louisiana corporation, with its principal place of business in Lafayette, Louisiana. American is an international marketing agent for Technical Industries, Inc. ("Technical"), a Houston-based company that designs and manufactures UT units. In this capacity, American performed the following functions for Technical: (1) international marketing; (2) ensuring

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

Technical's customers received its products; (3) guaranteeing customers' payment to Technical; and (4) service and technical support for Technical's UT units placed with customers. American does not design or manufacture any UT units, nor possess any patent or trademark protection as to such equipment.

American supplied TAMSA with UT units manufactured by Technical on two separate occasions: a 1995 sale and a 1997 lease. In December of 1995, American sold TAMSA a UT unit and this purchase was memorialized by a purchase agreement dated December 12, 1995. The 1995 purchase agreement was silent as to the confidentiality or proprietary nature of any alleged trade secrets, contained no restrictions that prevented TAMSA from making design changes to the UT unit, and did not require TAMSA to purchase spare parts for the UT unit from American. In conjunction with this sale, American provided TAMSA with the unit's operation manual, electrical wiring diagram, and mechanical drawings. A separate lease agreement was also signed on December 12, 1995, whereby TAMSA rented a UT unit from American for a four month period, while the new UT unit that it agreed to purchase was being manufactured. Sfeir drafted each of these agreements. The purchased unit was completed and ultimately was delivered to TAMSA in the summer of 1996.

In mid-1997, TAMSA needed another UT unit to meet its production demands and solicited bids from various UT unit suppliers, including American. On November 19, 1997, TAMSA entered into a lease agreement with American for the rental of a UT unit. The 1997 leased UT unit was built prior to the 1995 purchased UT unit. The 1997 lease agreement provided that TAMSA must keep the terms of the lease confidential, but the lease was silent as to the confidentiality or proprietary nature of any alleged trade secrets. The lease was not accompanied by or signed in conjunction with

3

a purchase agreement. Sfeir drafted this agreement. The 1997 lease forms the basis for this lawsuit and appeal.

Technical's UT equipment was built primarily through the efforts of Technical employees, John Krajewski ("Krajewski") and Joe Rose. According to Krajewski, the UT unit purchased in 1995 was "extremely similar" to the UT unit leased in 1997. The only major difference between the two UT units was the addition of a data acquisition package to the 1995 purchased UT unit.[1] However, the 1997 leased UT unit contained a ET-26A board, which was a slightly different, allegedly upgraded version of the ET-26 board installed on the 1995 purchased UT unit.

Sfeir testified during his deposition that he did not know whether Technical required confidentiality of other parties with whom it did business. At his deposition, Krajewski testified that while he worked for Technical, its customers were allowed to photograph, inspect, and examine Technical's UT units, including the 1997 leased UT unit. Additionally, photographs of Technical's UT units, and their component parts, were available on Technical's web page. Although Sfeir testified that he tried to "[k]eep it short," American's competitors were permitted to view photographs of Technical's UT units at trade shows.

In conjunction with the 1995 lease and when discussions began between TAMSA and American that lead to the 1997 lease, Sfeir made it clear that the rental of a UT unit was contingent upon TAMSA purchasing a new UT unit from American, and TAMSA acknowledged this rental offer. On October 29, 1997, American again advised TAMSA that the rental unit "is to help our clients when they buy new equipment from us or have us renovate old equipment," and TAMSA

---

[1] Krajewski testified that the data acquisition package was added to "plot[] where the indication was on both the X and Y position of the pipe," although it never completely worked.

4

again acknowledged this rental proposal. TAMSA's Chief Executive Officer, Martin Berardi, testified that if TAMSA had not been able to lease American's UT unit in November of 1997, TAMSA would have lost revenues and it would have been detrimental to their commercial objectives. Further, TAMSA's internal e-mails on November 6th revealed that it had conducted a worldwide search which showed that American's UT unit was the only one available, that TAMSA was in need of a UT unit, and that American's UT unit needed to be acquired without delay. Sfeir's affidavit indicates that during negotiations for the 1997 lease, TAMSA represented to Sfeir that it intended to purchase its UT unit from American.

The 1997 lease provided for the rental of a UT unit for twelve months at a rate of $31,500 per month. Pursuant to the 1997 lease, TAMSA's obligations under the lease were secured by a letter of credit (LOC) in the amount of $650,000 that TAMSA established with Banco Santander (issuing bank) and Hibernia National Bank ("Hibernia") (confirming bank). According to the 1997 lease and the LOC, the purpose of the LOC was to ensure the return of the UT unit, the payment of all money owed to American and its contractors, and compliance with the terms of the lease. The lease agreement and the LOC were nego tiated and drafted by Sfeir and accepted by TAMSA. In September of 1998, the parties agreed to extend the lease through May of 1999 at a rate of $34,000 per month and to extend the expiration date of the LOC to July 30, 1999.

The last sentence in paragraph VI of the 1997 lease (the "contingent upon" clause) provides that "[t]his lease is contingent upon Lessee buying their new or used [UT] Units from Lessor, and having Lessor renovate any inspection equipment needed by Lessee while the unit is being leased." The 1997 lease also provided that "[a]ll spare parts replaced must remain original, and must be purchased from Lessor." American provided evidence that at the time it entered into the 1997 lease,

5

TAMSA knew that it was going to purchase a new UT unit, but was no longer considering purchasing that equipment from American. By October of 1997, there is evidence that TAMSA had decided to purchase its new UT unit from a third party and that the commercial negotiations were at an advanced stage. Additionally, TAMSA did not advise American when it purchased its new UT unit from that third party in February or March of 1998.

There is also evidence that as of October of 1997, internal requests were being made by Arnulfo Ruiz to allow expenditures of $425,000 for renovation of the electronic equipment on TAMSA's existing UT units. During the term of the 1997 lease, Sfeir made numerous inquiries into, and expressed desire to perform, any renovations of TAMSA's equipment and TAMSA's professed its intent to comply with its lease obligations. However, American was never offered an opportunity to bid on any renovations. American provided evidence that TAMSA undertook renovation of its existing equipment through other contractors. Furthermore, there is evidence that TAMSA manufactured and/or purchased from parties other than American spare or replacement parts for the 1997 leased UT unit, which TAMSA left on the unit when it was returned to American. Near the end of the 1997 lease, Sfeir also discovered that TAMSA copied the electronic circuitry from the ET-26A board in the 1997 leased UT unit.

In May of 1999, TAMSA returned the leased UT unit from Veracruz to Technical's facility in Houston, as designated by American. On May 29, 1999, following an inspection of the 1997 leased UT unit, a TAMSA representative acknowledged damage to the UT unit, as well as the presence of reproduced and replacement parts on the UT unit. On July 7, 1999, American faxed two invoices dated July 1, 1999 to TAMSA for amounts allegedly due under the lease, charging $68,000 for "downtime" and $130,925 for replacement parts and alleged physical damage to the UT unit.

6

Sfeir also notified TAMSA by letter of claims for alleged breach of contract. This letter, dated July 7th, made a "formal demand" for four separate categories of damages and stated that Technical was still repairing the unit. On July 12, 1999, Sfeir submitted an "invoice" to Hibernia for payment under the LOC, representing that "[a]ll money owed was not paid in full," that "[n]ot all the terms of the lease were followed," and that American was entitled to the entire $650,000. On its face, the invoice conformed to the terms of the LOC, and Hibernia paid the entire sum to American.

TAMSA filed breach of contract, fraud, and conversion claims against American and Sfeir in the Western District of Louisiana, alleging that they wrongfully drew down the entire $650,000 irrevocable LOC. American counterclaimed, seeking damages for alleged breach of contract, violations of the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA), LA. REV. STAT. § 51:1401 et seq. (West 1987), violations of the Louisiana Uniform Trade Secrets Act (LUTSA), LA. REV. STAT. § 51:1431 et seq. (West 1987), and punitive damages.

American and Sfeir filed motions for partial summary judgment, seeking dismissal of TAMSA's fraud and conversion claims. TAMSA filed four motions for summary judgment, seeking dismissal of American's counterclaims for (1) punitive damages, (2) breach of contract under paragraph VI of the lease, (3) unfair trade practices, and (4) violations of trade secret law.

The district court denied American's motion, but granted Sfeir's motion. Further, the court granted TAMSA's motions on American's punitive damages and breach of contract counterclaims and denied TAMSA's motions on American's unfair trade practices and trade secrets counterclaims. The district court gave no explanation for its ruling on the parties' motions for summary judgment and partial summary judgment.

7

On August 8, 2000, the district court issued an order certifying its punitive damages, breach of contract under paragraph VI of the lease, fraud, and conversion rulings as final and appealable pursuant to Federal Rule of Civil Procedure 54(b) and finding its LUTPA and LUTSA rulings warranted immediate appeal pursuant to 28 U.S.C. § 1292(b). The district court did not give any reasons in support of its decision to grant the Rule 54(b) motion.

In this appeal, TAMSA challenges the district court's grant of partial summary judgment, dismissing its fraud and conversion claims against Sfeir. TAMSA also appeals the district court's denial of its motion for summary judgment on American's LUTPA and LUTSA counterclaims. American cross-appeals the dismissal of its counterclaims for breach of contract and punitive damages.

DISCUSSION

I.      Standard of Review

This Court reviews a grant or denial of summary judgment *de novo*. Mowbray v. Cameron County, Tex., 274 F.3d 269, 278 (5th Cir. 2001). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. Geoscan, Inc. of Tx. v. Geotrace Techs., Inc., 226 F.3d 387, 390 (5th Cir. 2000). We must view the facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. Id. Questions of law are reviewed *de novo*. Mowbray, 274 F.3d at 278.

II.     Grant of Summary Judgment for Sfeir on TAMSA's Fraud and Conversion Claims

8

TAMSA argues that the district court erred by granting Sfeir's motion for partial summary judgment on its fraud and conversion claims. We agree.

Although the district court did not assign reasons for its ruling, our review of the transcript of the motion hearing proceedings leads us to conclude that the court's dismissal of TAMSA's claims against Sfeir must have rested on a belief that he could not be held personally liable because he was protected by his capacity as a corporate officer. First, the court seemed to be concerned that TAMSA did not plead piercing the corporate veil under the "alter ego" doctrine by alleging commingling of corporate and officer funds. Second, the court concluded, "If Mr. Sfeir was the president of the corporation and he went to the bank and the bank issued the money to the corporation, and it went into a corporate account, then you sue the corporation. . . . And then you pierce the corporate veil to go after the corporate owner who may have commingled or used those funds." Third, the court also expressed concern with the fact that TAMSA had no proof that the money drawn down on the LOC personally benefitted Sfeir. Because the transcript had little detail on the evidence of fraud and conversion in this case, the district court's decision is best viewed as based upon categorical rules regarding when a corporate officer can be held individually liable under Louisiana law. Thus, we review these conclusions of law *de novo*. Halloran v. Veterans Admin., 874 F.2d 315, 320 (5th Cir. 1989). As to each of the district court's conclusions, we disagree. Based upon Louisiana law, we find that Sfeir may be held personally liable if he committed fraud or conversion on behalf of the corporation.[2]

---

[2] American accepts the premise that a Louisiana corporate officer can be liable for fraud and conversion practiced on behalf of a corporation. Principal Brief of Appellees-Cross Appellants, No. 00-31187, at 16-17, 21-22.

The general rule is that a corporation is a distinct legal entity, separate from those who comprise it, and unless directors or officers purport to bind themselves individually, they do not incur personal liability for corporate debts. Riggins v. Dixie Shoring Co., Inc., 590 So. 2d 1164, 1168-69 (La. 1991). The exception to this rule is when there is a justification for piercing the corporate veil. Id. Under Louisiana law, the corporate veil may be pierced under the "alter ego" doctrine, where the corporate entity is disregarded to such an extent that the affairs of the corporation are indistinguishable from the affairs of the officer or director. First Downtown Dev. v. Cimochowski, 613 So. 2d 671, 676 (La. Ct. App. 1993). Indicia of this disregard include commingling of corporate and officer funds. Id. Another basis for piercing the corporate veil, which applies in this case, is where "[a] director or officer who has practiced fraud upon any person, may be held personally liable for the resultant damages." Id. Louisiana specifically preserves by statute "any rights which any person may by law have against a . . . director or officer [of a corporation] because of any fraud practiced upon him by any of such persons." LA. REV. STAT. ANN. § 12:95 (West 1994). Contrary to the district court's conclusion, an action seeking to hold a corporate officer or director personally liable for fraud is separate from and does not require disregard of the corporate entity under the alter ego doctrine. Id. Thus, Sfeir may be held personally liable if he committed fraud.

Further, even absent intent to defraud, Louisiana law provides that a corporate officer may be held personally liable for damages resulting from his acts of conversion committed on behalf of the corporation. United States v. Hibernia Nat'l Bank, 882 F.2d 961, 964 (5th Cir. 1989). In Hibernia, this Court held, applying Louisiana law, that a corporate officer could not escape personal liability for conversion on the grounds that his status as a corporate officer protected him from liability absent conscious wrongdoing. Id. at 965. We specifically premised personal liability on the corporate

10

officer's participation in the corporation's act of conversion, as opposed to personal benefit, if any, that the corporate officer gained from the conversion. Id. Thus, Sfeir may be held personally liable for conversion committed on behalf of the corporation, even if he did not gain personally.

TAMSA argues that the district court erred in granting Sfeir's motion for partial summary judgment because it presented evidence sufficient to create a genuine issue of material fact regarding whether Sfeir, acting through American, committed fraud and conversion in drawing down the entire $650,000 irrevocable LOC. Fraud is defined as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to another." LA. CIV. CODE art. 1953 (West 1987). Two elements essential to establishing fraud are (1) an intent to defraud or to gain an unfair disadvantage and (2) a resulting loss or damage. First Downtown Dev., 613 So. 2d at 677. "A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion." Quealy v. Paine, Webber, Jackson & Curtis, Inc., 475 So. 2d 756, 760 (La. 1985). The intent requirement for conversion is not conscious wrongdoing, but rather, an intent to exercise a dominion or control over the goods that is inconsistent with another's rights. La. State Bar Ass'n v. Hinrichs, 486 So. 2d 116, 121 (La. 1986). A mistake of law or fact is not a defense. Id. Further, "[i]t is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from his act." Quealy, 475 So. 2d at 760.

The district court found that there were genuine issues of material fact pertaining to fraud and conversion on the part of American, and thus denied American's motion for partial summary judgment on TAMSA's claims against American. American did not appeal the denial of its motion.

11

We can conceive of no reason, other than the district court's erroneous belief that Sfeir was protected by his status as a corporate officer, for this inconsistent ruling. The allegations underlying TAMSA's fraud and conversion claims against American and Sfeir would be identical because Sfeir was acting for American. As such, we conclude that the district court's summary judgment ruling as to Sfeir was erroneous.

III.    Denial of Summary Judgment for TAMSA on American's LUTPA Counterclaim

TAMSA contends that it is entitled to summary judgment on American's LUTPA counterclaim because American lacks standing to assert the counterclaim. It also argues that the counterclaim is perempted under Louisiana law. Additionally, TAMSA contends that the evidence is insufficient to raise a genuine issue of material fact that TAMSA engaged in the type of "egregious" conduct that forms the basis of a LUTPA violation. The district court correctly rejected the three arguments asserted by TAMSA.

LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. ANN. § 51:1405(A). To recover under LUTPA, a plaintiff must "prove some element of fraud, misrepresentation, deception or other unethical conduct." Omnitech Intern., Inc. v. Clorox Co., 11 F.3d 1316, 1332 (5th Cir. 1994). "A trade practice is unfair under the statute only when it offends established public policy and is immoral, unethical, oppressive or unscrupulous." Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc., 220 F.3d 396, 404 (5th Cir. 2000). What constitutes an unfair trade practice is determined by the courts on a case-by-case basis. Omnitech Intern., Inc., 11 F.3d at 1332.

TAMSA argues that American lacks standing to bring a LUTPA claim because there is insufficient evidence that TAMSA and American are "competitors," as required to find a party liable

12

under LUTPA. LUTPA confers a private right of action on "[a]ny person who suffers any ascertainable loss of money or movable property . . . as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405." LA. REV. STAT. ANN. § 51:1409(A). LUTPA's private right of action is limited to direct consumers or to business competitors. Computer Mgmt. Assistance Co., 220 F.3d at 405. Thus, to have standing under LUTPA, American must demonstrate that it is either a consumer or a business competitor of TAMSA. American has put forth evidence to support its allegation that it is a business competitor. In order to qualify as a business competitor under LUTPA, American must actually or potentially engage in business that competes directly or indirectly with TAMSA as a business competitor. See Delta Truck & Tractor, Inc. v. J.I. Case Co., 975 F.2d 1192, 1205 (5th Cir. 1992); Tessier v. Moffatt, 93 F. Supp. 729, 734 (E.D. La. 1998); Morris v. Rental Tools, Inc., 435 So. 2d 528, 533 (La. Ct. App. 1983).[3] As a manufacturer and seller of steel pipe, TAMSA's business required that many of its pipes undergo ultrasonic testing. Prior to 1993, ultrasonic testing was provided to TAMSA's customers through a third-party contractor, Tubotest. When TAMSA acquired Tubotest in 1993, TAMSA became the only provider of ultrasonic testing available in Veracruz. At the time the 1997 lease was being negotiated, TAMSA could not supply all of the ultrasonic testing demanded by its

---

[3]LUTPA is modeled after the Federal Trade Commission Act, 15 U.S.C. § 45, and "[t]he Louisiana courts have recognized the appropriateness of referring to federal interpretation when deciding unfair trade practices cases." Omnitech Intern., Inc., 11 F.3d at 1331-32 & n.23. In Federal Trade Comm'n v. Raladam Co., the Supreme Court, in addressing the meaning of business competitor in the federal statute, noted that:

> It is obvious that the word 'competition' imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors–that is to say, the trader whose methods are assailed as unfair must have present or potential rivals in trade whose business will be, or is likely to be lessened or otherwise injured.

283 U.S. 643, 649 (1931).

customers and had the choice of either allowing third parties to provide ultrasonic testing for TAMSA's pipes or acquiring another UT unit. Viewing the evidence in a light most favorable to American, if TAMSA had not acquired American's UT unit, the customers that TAMSA and American had in common would have gone directly to American for ultrasonic testing or American would have been in a position to provide another pipe manufacturer with its UT unit. Thus, by securing the 1997 lease, which is at issue in this litigation, TAMSA avoided the potential for American to directly or indirectly compete with TAMSA for the provision of UT services. We conclude on this summary judgment record that American has standing to bring suit against TAMSA.

With regard to the peremption argument, the summary judgment hearing transcript indicates that the district court agreed with American's argument that its LUTPA counterclaim was not time-barred because TAMSA's conduct during the lease was a "continuing violation" that did not abate until the termination of the 1997 lease, and thus extended the period for filing the LUTPA claim. We agree. American's LUTPA counterclaim was filed on August 11, 1999 and alleged conduct in continuing violation of LUTPA by TAMSA through May of 1999; only at that time did the one-year LUTPA limitations period begin to run.[4]

Although this Court has not previously addressed whether the continuing violation doctrine applies to the LUTPA preemptive period, we have noted the tension between the Louisiana appellate

---

[4]LUTPA provides that a private action "shall be prescribed by one year running from the time of the transaction or act which gave rise to the right of action." LA. REV. STAT. § 51:1409(E). Louisiana courts have interpreted this period to be peremptive rather than prescriptive. America's Favorite Chicken Co. v. Cajun Enters., Inc., 130 F.3d 180, 185 & n.6 (5th Cir. 1997). Most significantly, peremption is not subject to suspension, interruption, or renunciation. Louisiana v. McInnis Bros. Constr., 701 So. 2d 937, 939 (La. 1997). The doctrine of *contra non valentum*, which suspends the running of prescription where the cause of action is not known or reasonably knowable by the plaintiff, is inapplicable to a peremptive period. Id. at 939-40.

court and federal district court decisions within this circuit. America's Favorite Chicken Co. v. Cajun Enters., Inc., 130 F.3d 180, 185 (5th Cir. 1997). Three Louisiana Court of Appeal cases have found that where a violation of LUTPA is continuing, the peremptive period does not begin to run until the violation ceases. Capitol House Preservation Co. v. Perryman Consultants, Inc., 725 So. 2d 523 (La. Ct. App. 1998) (holding that the defendant successful applicants for riverboat gaming licenses engaged in a continuing tort by allegedly failing to disclose fraudulent and misleading material information submitted to the Gaming Enforcement Division, in violation of the continuing statutory duty to disclose violations of the Riverboat Act, and thus the LUTPA peremptive period began to run anew each day the successful applicants continued to withhold information); Benton, Benton & Benton v. La. Pub. Facilities Auth., 672 So. 2d 720, 723 (La. Ct. App. 1996) (holding that the LUTPA peremptive period cannot begin to run as long as violations of LUTPA continue); Fox v. Dupree, 633 So. 2d 612 (La. Ct. App. 1993) (holding that the LUTPA peremptive period could not begin to run until the defendant loan broker complied with the bond filing and disclosure requirements of the Louisiana Loan Brokers' statute because every day the loan broker was in violation gave rise to a new right of action for an unfair trade practice). Each of these state court decisions were rendered after the federal district court decisions in Neill v. Rusk, 745 F. Supp. 362, 365 (E.D. La. 1988), and Cason v. Texaco, Inc., 621 F. Supp. 1518, 1523 (M.D. La. 1985), which held that the continuing violation doctrine does not apply to the LUTPA peremptive period. Because we find these recent Louisiana appellate court opinions persuasive, and the federal district courts did not have the benefit of these cases, we hold that the continuing violation doctrine applies to the LUTPA peremptive period.

TAMSA asserts that the continuing violation doctrine should have limited applicability to LUTPA claims; specifically, it submits that the doctrine should only be applied to LUTPA claims based on statutory violations, as in Fox and Capitol House. Further, TAMSA argues that American has not alleged conduct that is continuing in nature, but rather numerous separate and distinct breaches of contract giving rise to American's LUTPA counterclaim. We are not persuaded. During the entire term of the 1997 lease, TAMSA was under a statutory duty to perform its obligations under the lease in good faith. See LA. CIV. CODE. ANN. art. 1983 (West 1987). American alleged continuous unfair or deceptive actions by TAMSA throughout the lease period. Specifically, American contends that TAMSA denied that it was illegally copying parts; promised that it would abide by its obligations under the 1997 lease; denied, and continues to deny, that it made renovations to existing equipment; copied parts for the 1997 leased UT unit; and never advised American that it intended to purchase, or that it purchased, a new UT unit from a party other than American. American's allegations that TAMSA violated its obligations under the lease and failed to comply with the duty of good faith are of a continuous nature, and may constitute an unfair trade practice should the factfinder so determine after trial of the case. LUTPA's peremptive period did not begin to run until the lease ended in May of 1999.

We now turn to TAMSA's argument that American's counterclaim is not actionable under LUTPA because it alleges mere breach of contract, which does not rise to the level of "egregious" behavior that LUTPA proscribes. While TAMSA correctly points out that LUTPA "does not provide an alternative remedy for simple breaches of contract," Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir. 1993), considering the deceptive and unethical undertones of TAMSA's alleged behavior during the 1997 lease period, we conclude that American's LUTPA counterclaim is not

16

properly characterized as a mere breach of contract claim. Thus, we affirm the district court's denial of summary judgment on American's LUTPA counterclaim.

IV.     Denial of Summary Judgment for TAMSA on American's LUTSA Counterclaim

TAMSA next argues that it is entitled to summary judgment on American's LUTSA counterclaim because American did not own the alleged trade secrets and thus lacks standing to assert the counterclaim. It also contends that American waived its LUTSA counterclaim by failing to maintain the secrecy of the alleged "trade secrets." Further, TAMSA asserts that the evidence is insufficient to raise a genuine issue of material fact that TAMSA misappropriated any trade secrets. The trial court rejected the three arguments asserted by TAMSA. The court determined that there were genuine issues of material fact, stating during the motion hearing that the LUTSA counterclaim raised "serious issues." Even if we assume that American has standing[5] and that there is a genuine issue of material fact as to whether TAMSA misappropriated the alleged "trade secrets," we hold that the summary judgment evidence demonstrates an absence of genuine issue of material fact as to whether American used reasonable efforts under the circumstances to maintain the secrecy of the alleged "trade secrets."

To recover damages under LUTSA, a plaintiff must prove (1) the existence of a trade secret, (2) a misappropriation of the trade secret, and (3) actual loss caused by the misappropriation. Reingold v. Swiftships, Inc., 126 F.3d 645, 648 (5th Cir. 1997). Under LUTSA, a "trade secret" is defined as:

---

[5]The undisputed evidence proves that American does not own the UT designs constituting the alleged trade secrets or the 1997 leased UT unit; Technical does. Thus, there is some question as to whether American has standing, as a non-owner, to assert a LUTSA claim.

17

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
> (b) is the subject of efforts that are reasonable under the circumstances to maintain secrecy.

LA. REV. STAT. ANN. § 51:1431(4). Comment (f) under this provision shows that LUTSA adopts the concept of "relative secrecy" rather than "absolute secrecy." Sheets v. Yamaha Motors Corp., U.S.A., 849 F.2d 179, 183 (5th Cir. 1988).[6]  " 'The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets.' "  Id. (quoting Tubular Threading, Inc. v. Scandaliato, 443 So. 2d 712, 714 (La. Ct. App. 1983)).  "A disclosure of a trade secret to others who have no obligation of confidentiality extinguishes the property right in the trade secret."  Id. at 183-84.

American primarily points to the 1997 lease agreement as evidence that it used reasonable efforts to maintain the secrecy of alleged "trade secrets" with respect the 1997 leased UT unit. Specifically, the 1997 lease contained a confidentiality provision; provided that "[s]elected [TAMSA] personnel authorized by [American] will be allowed in, and around the unit"; prohibited TAMSA from hiring American's employees; and required all replacement parts to be purchased from

---

[6]Comment (f) under this provision provides:
> Reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a "need to know basis", and controlling plant access.  On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection. . . .  Reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

LA. REV. STAT. ANN. § 51:1431 cmt. (f).

American. Further, American notes that Krajewski testified that the diagrams of circuitry provided by American to TAMSA contained the following: "Proprietary Notice: This document contains proprietary information and is loaned to the receiver in confidence. Its contents may not be disclosed without the prior written permission of Technical Industries, Inc." As TAMSA points out, the confidentiality provision of the 1997 lease agreement required only that the parties keep the terms of the lease itself confidential, not any information pertaining to the design of the UT unit.[7] Further, Krajewski's testimony was referring to the manual and diagrams that American provided TAMSA in conjunction with 1995 sale so that TAMSA would be able to make repairs on that UT unit; specifically, there was a "proprietary notice" stamped on two drawings of the E-26 board installed on the 1995 purchased UT unit. There is no evidence that any diagrams of the E-26A board accompanied the 1997 leased UT unit, much less that they contained a similar "proprietary notice."

Although Louisiana law does not provide us with the precise contours of what constitutes relative secrecy, our decisions in Reingold and Sheets are instructive. In Reingold, which involved the commercial lease of a boat mold used in constructing hulls for fiberglass boats, this Court held that genuine issues of material fact existed to preclude summary judgment on the lessor's LUTSA claim against the lessee. We found that the summary judgment record indicated that the lessor used reasonable efforts under the circumstances to maintain the secrecy of the boat mold. Prior to leasing the boat mold, the lessor "maintained exclusive control and did not disclose it to or allow its use by anyone." 126 F.3d at 650. The lessor and lessee entered into a written lease which provided as follows:

---

[7] Paragraph VIII of the lease agreement states that "[t]his lease must be kept confidential and Lessee may not disclose it to any one other then [sic] their purchasing managers and concerned managers only."

19

> [T]he mold would be used exclusively by [lessee], any movement of the mold from lessee's shipyard would be contingent upon [lessor's] prior approval, the lessee would give advance written notice to lessor before using the mold in the construction of each vessel hull, the lessee would have exclusive non-transferrable use of the mold, the lessee would not assign or transfer any interest in the mold, and the lessee, at the conclusion of the lease, would turn over all copies of the design data for any modifications made to the mold.

Id. Sheets involved the alleged misappropriation of a purported inventor's modification to the Yamaha tri-motorcycle. The district court dismissed the inventor's LUTSA claim under Federal Rule of Civil Procedure 41(b) after finding that the inventor had failed adequately to maintain the secrecy of his modification. On appeal, we affirmed the dismissal. Prior to the alleged misappropriation, the inventor allowed one of the modified tri-motorcycles to be shown at a Yamaha service seminar, let a motorcycle dealership use a modified tri-motorcycle as a demonstrator model without restriction, installed modification on at least nine tri-motorcycles owned by individuals on the dealership's tri-motorcycle racing team and gave them only minimal instructions not to reveal the modification to others, and also allowed several Yamaha representatives to enter the dealership and examine and photograph his modification without taking any efforts to maintain its secrecy.

Upon our review of the record, the summary judgment evidence indicates that American did not exert efforts that were reasonable under the circumstances to preserve the secrecy of any alleged proprietary information concerning the 1997 leased UT unit. The district court provided no reasons for its conclusion that there were genuine issues of material fact as to whether relative secrecy exists. In sum, the 1997 lease agreement is the only evidence that American puts forth of its measures to maintain relative secrecy. While the 1997 lease agreement limited the access that TAMSA's employees would have to the UT, it is silent as to what information American considered to be a trade secret and contains no restrictions on TAMSA's use of the information or its disclosure to other

20

parties. Further, prior to leasing the 1997 UT unit, American sold TAMSA a substantially similar UT unit in 1995 and allowed several competitors to view photographs of the UT units. Apparently, Technical also allowed customers to photograph, inspect, and examine the 1997 leased UT unit without taking any efforts to maintain secrecy. American's limited attempts, if any, at secrecy do not amount to reasonable efforts under the circumstances. Thus, we conclude that TAMSA is entitled to summary judgment on American's LUTSA counterclaim.

V.      Grant of Summary Judgment for TAMSA on American's Breach of Contract Counterclaim

We first must address whether the district court's ruling on American's counterclaim for breach of contract concerning paragraph VI of the lease agreement was suitable for entry as a final judgment under Federal Rule of Civil Procedure 54(b). Rule 54(b) provides that "[w]hen more than one claim for relief is presented in an action," a district court "may direct the entry of a final judgment as to one or more but fewer than all of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." FED. R. CIV. P. 54(b). The Rule 54(b) requirement that the district court must have disposed of "one or more . . . claims" in order to enter a final judgment is jurisdictional. Eldredge v. Martin Marietta Corp., 207 F.3d 737, 740 (5th Cir. 2000). We review the Rule 54(b) certification *de novo.* Id.

When some of the same facts form the basis for several claims, the existence of separate claims for purposes of Rule 54(b) depends on an analysis of their distinctness.[8] Id. at 740-42. For this Court to have jurisdiction under Rule 54(b), the district court's ruling that the "contingent upon"

---

[8]In Eldredge, we dismissed the appeal of partial summary judgment for want of jurisdiction where a statute of limitations ruling that precluded recovery for a past time period but allowed such recovery for a current time period was not suitable for entry of final judgment because it did not create two distinct claims for purposes of Rule 54(b)'s requirement that the court dispose of one or more claims, given the strong factual overlap between the prescribed and non-prescribed portions of the claim.

21

clause constituted a resolutory condition must have resolved a dist inct "claim for relief" against TAMSA, as contemplated in Rule 54(b). This Court has not expressly adopted a method for determining what constitutes a distinct "claim for relief" under Rule 54(b). We have recognized, however, that various courts have looked to the possibility of separate recoveries, have concentrated on the underlying facts, and have invoked claim-preclusion rules. Id. at 741.

American argues that because the district court's ruling in this case runs afoul of each of these competing methods, it was not appropriate for designation for a Rule 54(b) final judgment. Further, American contends that because it is unclear from the district court's partial summary judgment ruling whether the court precluded its entire breach of contract claim or merely part of its claim, the ruling will create confusion at trial. Specifically, the district court made no factual findings and drew no conclusions as to the parties' intent with respect to the "contingent upon" clause or as to whether TAMSA acted in good faith when it entered into the lease and in its effort to perform under the lease.

It was American, however, that requested Rule 54(b) certification of the district court's grant of partial summary judgment pertaining to the resolutory condition. In making this request, American told that court that paragraph VI was the "heart and soul" of its contract case against TAMSA. Thus, the district court's order granted "the Motion for Summary Judgment in regard to the Resolutory Condition in the Lease Agreement as a bar to Defendant's Counterclaim under Paragraph VI of the Lease Agreement," dismissed American's counterclaim "for contract damage claims under Paragraph VI of the lease," and granted Rule 54(b) certification. In ruling on American's Motion to Reconsider or Alternatively to Clarify Ruling, the district court stated that "the issues of good faith are still before the jury." American responded as follows: "I guess the bottom line is if the good

22

faith/bad faith issues are still alive, that tells me what I need to know. I think the rest of it becomes clear."

It seems evident that the district court's ruling that the "contingent upon" clause was a resolutory condition, which was the "heart and soul" of American's contract claim, set aside American's counterclaim for breach of contract. Facts pertaining to TAMSA's lack of good faith, such as whether TAMSA negotiated the 1997 lease in bad faith, and violations of TAMSA's obligations under the 1997 lease, apart from paragraph VI, are subsumed in American's remaining LUTPA counterclaim and its potential fraudulent inducement claim against TAMSA. Those facts are wholly separate from American's breach of contract claim based upon paragraph VI's "contingent upon" clause. We conclude that American's breach of contract claim constituted a distinct "claim for relief." Thus, the district court's ruling was suitable for entry as a final judgment under Rule 54(b) and is, consequently, appropriate for appellate review. We now turn to the merits of American's appeal.

American next challenges the district court's holding that the "contingent upon" clause created a resolutory condition under Louisiana law. The disputed clause states, "This lease is contingent upon Lessee buying their new or used Ultrasonic Inspection Units from Lessor, and having Lessor renovate any inspection equipment needed by Lessee while the unit is being leased." American asserts that rather than creating a condition to the 1997 lease, the "contingent upon" clause constituted an unconditional promise on the part of TAMSA. TAMSA counters that American's interpretation is contrary to the plain language of the 1997 lease.

In Louisiana, the construction of an unambiguous contract is a question of law. Tex. E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998). We review the

23

construction of an unambiguous contract *de novo*. Id. Under Louisiana statutory law, a court interpreting a contract shall determine the "common intent" of the parties. LA. CIV. CODE ANN. art. 2045 (West. 1987). However, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046 (West. 1987). Therefore, when the contract is not ambiguous, we have no authority to look beyond the four corners of the document. Tex. E. Transmission Corp., 145 F.3d at 741. Although the trial judge made no express finding that the "contingent upon" clause was unambiguous, he stated at the hearing on American's motion to reconsider that he relied on the "contractual language itself" in determining that the "contingent upon" clause was a resolutory condition. We agree with the district court's determination.

The "contingent upon" clause clearly and unambiguously creates a condition. See BLACK'S LAW DICTIONARY 315 (7th ed. 1999) (defining "contingent" as "[d]ependent on something else; conditional"); 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 38.16, at 442 (4th ed. 2000) ("Although no particular words are necessary for the existence of a condition, such terms as 'if,' 'provided that,' 'on condition that,' or some other phrase that conditions performance usually connote an intent for a condition rather than a promise."). As this interpretation does not produce any absurd consequences, it must be given effect without resort to parole evidence. Accordingly, we reject American's arguments that the parties' intended the "contingent upon" clause to obligate TAMSA to purchase a UT unit from American or allow American to renovate its UT units. If such a promise was the parties' true intent, the parties could have established a purchase agreement similar to the one that accompanied that 1995 lease agreement. It is undisputed that Sfeir drafted the 1997

24

lease agreement and we will not remedy Sfeir's failure to draft this lease provision to reflect such an obligation.

> Louisiana Civil Code article 1767 provides as follows:
>
> A conditional obligation is one dependent on an uncertain event.
> If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.
> If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory.

LA CIV. CODE ANN. art. 1767 (West 1987). "A *suspensive* condition *temporarily* postpones enforcement of an obligation until the occurrence of a particular event, but does not *end* [or *terminate or extinguish*] an obligation, as does a resolutory condition." Unkel v. Unkel, 669 So. 2d 472, 475 (La. Ct. App. 1997). In this case, it is clear that while the obligations of the 1997 lease could be immediately enforced, those obligations could come to an end upon the occurrence of a certain event. In other words, the 1997 lease was designed to take effect immediately, but was subject to being terminated if TAMSA did not buy their new or used UT units from American or did not allow American to renovate TAMSA's UT units during the lease term. Thus, American was entitled to terminate the contract if the resolutory condition was not fulfilled. See La Rose v. Defrense, 99 So. 2d 16, 19 (La. 1958).

American also argues that even if the "contingent upon" clause creates a resolutory condition, summary judgment was improper because it presented evidence which creates a genuine issue of material fact as to whether TAMSA (1) acted in good faith with respect to the Louisiana Civil Code articles 1770 and 1983, and (2) was at fault in preventing the fulfillment of the resolutory condition as contemplated in Louisiana Civil Code article 1772. These provisions of the Louisiana Civil Code are inapplicable to the issue of whether American can base a breach of contract claim on the

resolutory condition. Article 1770[9] is not applicable because, if anything, it is concerned with whether TAMSA, as the obligor entitled to terminate the lease,[10] exercised its right to terminate in good faith.[11] TAMSA never exercised its right to terminate the 1997 lease. Similarly, article 1772[12] is inapplicable because in this case, the resolutory condition was fulfilled when TAMSA purchased a new UT unit from a party other than American. Further, although article 1983 required TAMSA to perform its obligations under the lease in good faith, the "contingent upon" clause did not create a performance obligation on the part of TAMSA. We therefore affirm the ruling of the district court granting summary judgment on American's breach of contract claim regarding the "contingent upon" clause.

VI.     Grant of Summary Judgment for TAMSA on American's Punitive Damages Counterclaim

The district court granted summary judgment for TAMSA on American's punitive damages counterclaim without providing reasons for its decision. From the transcript of the summary

---

[9]Article 1770 provides that "[a] resolutory condition that depends solely on the will of the obligor must be fulfilled in good faith." LA. REV. STAT. ANN. art. 1770 (West 1987).

[10]Both TAMSA and American were obligated under the 1997 lease agreement. In that sense, both parties were obligors.

[11]Comments (f) to article 1770 sheds light on the obligation of good faith:
> In order to comply with the requirement of good faith, a party exercising his right to terminate a contract at will should consider not only his own advantage, but also the hardship to which the other party will be subjected. . . . If termination is improper under this article, the court may order either continuation of performance for the other party to overcome the hardship, or may grant damages to the party harmed by the termination.

LA. CIV. CODE. ANN. art. 1770 cmt.(f).

[12]Article 1772 states that "[a] condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment." LA. REV. STAT. ANN. art. 1770 (West 1987).

judgment hearing, however, it is evident that the district court applied Louisiana's choice of law rules and concluded that Louisiana law did not authorize punitive damages. American does not challenge the district court's application of Louisiana's choice of law rules; however, it contends that under Louisiana choice of law provisions, summary judgment should not have been rendered on its punitive damages counterclaim.

In determining the appropriate substantive law, the district court correctly looked to Louisiana choice of law rules because a federal court exercising diversity jurisdiction applies the choice of law rules of the forum state. See Marchesani v. Pellerin-Milnor Corp., 269 F.3d 481, 485 (5th Cir. 2001). The specific article dealing with a conflict of law determination in relation to punitive damages is Louisiana Civil Code article 3546, which provides:

> Punitive damages may not be awarded by a court of this state unless authorized:
> (1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled.
> (2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was domiciled.

LA. CIV. CODE ANN. art. 3546 (West 1994). This article is subject to the "escape clause" of article 3547 which makes a provision for "exceptional cases" where a court may determine that, although punitive damages may not be recoverable under article 3546, the denial of punitive damages would more seriously impair the policies of another state favoring such damages, and thereby may award punitive damage under the law of that state. Id. cmt.(g).[13]

---

[13]Louisiana Civil Code article 3547 reads as follows:
The law applicable under Articles 3543-3546 shall not apply if, from the totality of the circumstances of an exceptional case, it is clearly evident under the principles of Article 3542, that the policies of another state would be more seriously impaired if its law were not applied to the particular issue. In such event, the law of the other state shall apply.

27

Based on article 3546, American argues that Texas law should govern the imposition of punitive damages since the injurious conduct occurred in Texas and the resulting injury occurred in Texas. We disagree. American does not contend that TAMSA is domiciled in Texas. Even assuming that the "resulting injury occurred" in Texas, there is simply no support for American's contention that TAMSA's "injurious conduct occurred" in Texas. American asserts that the injurious conduct occurred when TAMSA initiated commencement of the 1997 lease by sending a letter to Technical in Texas, during lease negotiations through international telephone conversations or written communications between Texas and Mexico, when the UT unit was shipped from Houston to Veracruz at the commencement of the lease, and when the UT unit was returned from Veracruz to Houston at the termination of lease. Any injurious conduct, however, occurred in Louisiana and Mexico. American is a Louisiana corporation; the lease agreement was signed on behalf of American by Sfeir in Louisiana and on behalf of TAMSA by Erick Maldonado in Mexico; all lease payments were made to Sfeir in Louisiana; and TAMSA's alleged improper conduct during the lease term occurred in Mexico. Thus, the law of either Louisiana or Mexico governs the availability of punitive damages as to American's claim against TAMSA.

American does not dispute that Mexican law prohibits punitive damages or that Louisiana law generally prohibits punitive damages. However, American suggests that we embark on a conflict of laws exercise to determine whether this is an "exceptional case" as contemplated in Louisiana Civil Code article 3547. This argument is meritless. American, a Louisiana corporation, entered into a lease with TAMSA, a Mexican corporation with its headquarters in Veracruz. The lease, which was drafted by American, contained a Louisiana forum selection clause. American's remaining LUTPA

LA. CIV. CODE ANN. art. 3547 (West 1994).

counterclaim seeks redress for the harm caused by TAMSA, whose actions were centered in Mexico. The primary connection to Texas in this case is that the leased UT unit was physically located in Texas before it was shipped to TAMSA in Mexico and then returned from Mexico to Texas at the expiration of the lease. It is not "clearly evident" that there are exceptional circumstances present that would trigger the application of article 3547. Thus, we conclude that the district court's dismissal of American's punitive damages claim was proper.

## CONCLUSION

We AFFIRM the denial of TAMSA's motion for summary judgment on American's LUTPA counterclaim. In addition, we AFFIRM the grant of summary judgment for TAMSA on American's counterclaims for breach of contract and punitive damages. However, we REVERSE the district court's grant of summary judgment in favor of Sfeir on TAMSA's fraud and conversion claims against him personally. We also REVERSE the district court's summary judgment ruling on American's LUTSA claim. Accordingly, we remand for further proceedings not inconsistent with this opinion

AFFIRMED in part, REVERSED in part, and REMANDED.