# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2011

No. 10-11053

Lyle W. Cayce
Clerk

RICHARD ROCKWELL, Individually and as Co-Administrator of the Estate of Scott Rockwell, Deceased; CINDY ROCKWELL, Individually and as Co-Administrator of the Estate of Scott Rockwell, Deceased,

Plaintiffs–Appellants

v.

LIEUTENANT WILLIAM H. BROWN; OFFICER DAVID J. SCICLUNA; OFFICER DUSTIN D. RALEY; OFFICER COLLEEN OHLDE; OFFICER BILLY BURLESON; OFFICER MARIO GARCIA,

Defendants–Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY, DeMOSS, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

On February 14, 2006, six police officers from the Garland, Texas police department breached the locked door to the private bedroom of Richard and Cindy Rockwell's 27-year-old son, Scott, to arrest him for threatening his mother. Scott attacked the officers with two knives, and in the ensuing melee, the officers shot and killed him. The Rockwells sued the officers for excessive force, assault and battery, and unlawful entry. The district court granted summary judgment to the officers on the basis of qualified immunity and state-

No. 10-11053

law official immunity.  The Rockwells appealed.  We affirm the district court's grant of summary judgment on all claims.

## I.  BACKGROUND

The magistrate judge's report and recommendation, which was adopted by the district court, sets forth the relevant facts.[1]

> In February 2006, Plaintiffs Richard and Cindy Rockwell lived with their son Scott Rockwell at [their home] in Garland, Texas. Scott had his own bedroom and contributed to the rent.  Scott suffered from both bipolar disorder and schizophrenia.  Scott had also been diagnosed as suicidal and had attempted suicide on more than one occasion.  His mental condition and stability began to deteriorate in early February.  He had quit taking his prescribed medication and refused to see a doctor.  He began hearing voices and was behaving "unpredictably."  His parents believed he may have been under the influence of illegal drugs.
>
> On the evening of February 14, 2006, Scott was in his room hitting the walls and cursing through the door.  At one point during the evening, Scott came out of his room and raised his fist as if to hit his mother.  At approximately 8:38 p.m., Scott's parents called 911 because they believed that Scott ha[d] become a danger to himself and others.  The 911 dispatcher dispatched Officers Ohlde and Raley to the Rockwell home.  The dispatcher told the officers that Scott was bi-polar, schizophrenic, off his medication, and that he was pounding the walls of his room and refusing to come out. Officer Burleson offered over the radio to come "since there was a potentially dangerous subject there."  Officer Ohlde accepted Burleson's offer of assistance.
>
> Officer Burleson was the first to arrive at the scene, arriving at approximately 8:45 p.m.  Officers Ohlde and Raley arrived soon thereafter.  At the Rockwell home, Mrs. Rockwell told the police that Scott had schizophrenia, was talking to himself, hadn't taken his medication for several days, refused to come out of his room, and that she believed that Scott was taking illegal drugs.  When the officers asked Mrs. Rockwell what Scott would likely do if they were to leave without detaining Scott, she answered that she did not know.

---

[1] The facts were mostly undisputed, but where there was a dispute, it was resolved in favor of the Rockwells. *See Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 233 (5th Cir. 2009).

No. 10-11053

Officers Ohlde, Burleson, and Raley attempted to communicate with Scott through his bedroom door. Scott was threatening the officers from his room and had indicated that "he thought someone had put 'cum' in his mouth." The Officers believed that Scott was suggesting he had been sexually assaulted. Officer Raley advised Officers Ohlde and Burleson that the SWAT team had been called to respond to Scott on at least one prior occasion and had taken Scott into custody for threatening and assaulting his parents. At about this time, Officer Ohlde called Lieutenant Brown ("Lt. Brown" or "Brown") who then came to the scene. At some point after Lt. Brown was called, but before he arrived, Officer Raley called for another unit. Officers Garcia and Scicluna responded to this call. While Officers Burleson, Raley, and Ohlde waited for the additional units, Scott continued to bang on the walls, shake his door, and make threats to the officers.

At some point after Lt. Brown arrived, the decision was made to arrest Scott. The decision was made based on the assault by threat made earlier in the evening, Scott's history of violent and suicidal behavior, his unstable mental state, the possibility that Scott was high on drugs, and concern that Scott would harm his parents or himself if left in the residence. When the Officers told Cindy Rockwell that they may have to breach the door to effectuate an arrest, she suggested that she would wait until morning to get a mental-health warrant. The Officers, having determined that Scott was a threat, decided that it would be unsafe to leave him in the home until morning. The Officers had determined that Scott had barricaded himself inside of his room. After making repeated unsuccessful attempts to convince Scott to come out of the room, the police decided to breach the door.

At the time that the breach was made, Officer Scicluna was positioned at the door to kick it in. Lt. Brown ordered Scicluna to get low to stay out of the line of possible gunfire. Lt. Brown was holding a pepperball gun, and stood in the doorway to the bathroom across the hall from Scott's bedroom, behind Officer Scicluna. From the perspective of somebody facing the door into Scott's room from the hallway, Officers Burleson and Ohlde were positioned on the right side of the door, and Officer Raley was positioned on the left side of the door, near Lt. Brown. Officer Garcia was positioned by the back door. Richard and Cindy Rockwell were in the converted garage. One of the officers had his gun drawn at the time of the

No. 10-11053

breach. The door was breached sometime between 9:12 and 9:16 p.m.

Once the door was breached, Scott, holding two eight-inch serrated knives, rushed towards Lt. Brown and attacked him with the knives. Officer Burleson saw the knives and yelled "knives" to warn his fellow officers. Lt. Brown began to fire multiple rounds at Scott with the pepperball gun. Lt. Brown was able to deflect a number of these attacks with his pepperball gun. During the scuffle, Scott pushed Lt. Brown back into the bathroom with enough force that the commode broke. Scott then turned and began to run after Officer Scicluna while still swinging his knives. Scott swung the knives at Officer Scicluna, injuring him. At about this time, the officers shot at Scott.

Officer Burleson fired one shot which hit Scott in the abdomen. Officer Raley fired three shots, two of which hit Scott. One of Officer Raley's shots created stip[p]ling on Scott's neck, which is generally indicative of a shot fired two feet or less from the target. Scott fell down in front of Officer Scicluna. Officer Scicluna fired one shot, which hit Scott in the chin and neck. Officer Garcia fired either once or twice, but did not hit Scott. Officers Ohlde and Lt. Brown did not fire any shots from their firearms. In total six or seven shots were fired. The shots were mostly fired in rapid succession. Four of the shots hit Scott, and one hit Officer Raley. No party suggests that Scott had a gun or shot Officer Raley. Scott received wounds to the chin, neck, forearm, and abdomen.

At approximately 9:16, the Officers called for EMS and reported that Scott had been shot. Scott was pronounced dead at 10:04 p.m.

On February 13, 2008, the Rockwells, individually and on behalf of their son's estate, sued the officers for excessive force, and assault and battery. The Rockwells later amended their complaint to add claims against the officers for unlawful entry. On June 10, 2008, the magistrate judge recommended to the district court that the officers' motion for summary judgment be granted. On August 26, 2008, the district court adopted the magistrate judge's report and recommendation, overruled the Rockwells' objections, and entered summary judgment in favor of the officers. The Rockwells timely appealed.

No. 10-11053

## II.  JURISDICTION & STANDARD OF REVIEW

This Court has jurisdiction under 28 U.S.C. § 1291 and reviews a grant of summary judgment de novo, applying the same standard as the district court. *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).  Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).  We view all disputed facts and inferences in the light most favorable to the non-movant. *Hill,* 587 F.3d at 233.  Furthermore, we may affirm a grant of summary judgment "on any basis supported by the record."  *TIG Specialty Ins. Co. v. Pinkmonkey.com Inc.,* 375 F.3d 365, 369 (5th Cir. 2004).

## III.  DISCUSSION

### A.    Excessive Force

The Rockwells argue that the district court erred in granting summary judgment to the officers on the excessive-force claims on the basis of qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Therefore, the qualified-immunity inquiry has two prongs: (1) whether an official's conduct violated a constitutional right of the plaintiff, and (2) whether that right was clearly established at the time of the violation.  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).  "A court may rely

on either prong of the defense in its analysis." *Id.* (citing *Manis*, 585 F.3d at 843).

The burden is on the Rockwells to rebut the officers' qualified-immunity defense "by establishing a genuine fact issue as to whether the [officers'] allegedly wrongful conduct violated clearly established law." *Id.* (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005)). To prove that the officers violated Scott's Fourth Amendment right to be free from the use of excessive force, the Rockwells must show: "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Hill*, 587 F.3d at 243 (citing *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999)).

As in other Fourth Amendment contexts, the "reasonableness" inquiry is objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis*, 585 F.3d at 843 (citing *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009)). "The excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly

No. 10-11053

force]." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.")).

In this case, the evidence shows that after the officers breached the door to Scott's room, Scott ran out of his room and toward the officers, who were positioned in a small hallway. Scott, who was a relatively large man, held an eight-inch knife in each hand. Burleson saw the knives and warned the other officers that Scott was armed. Scott charged at Brown, who discharged his pepperball gun at Scott in an attempt to prevent him from cutting or stabbing any of the officers. During the ensuing scuffle, Scott pushed Brown into the bathroom with enough force to shatter the toilet. Scott then turned toward Scicluna and began swinging the knives at him. Scicluna suffered lacerations to his left arm and right shoulder. The parties disagree about when the first shot was fired, but the evidence, even when viewed in the light most favorable to the Rockwells, shows that all of the shots were fired after Scott charged out of his room with a deadly weapon in each hand in the direction of the officers. Under the totality of the circumstances, then, it was reasonable for the officers to believe that Scott posed a significant and imminent threat of serious physical harm to one or more of the officers. Consequently, the officers' decision to respond to that threat with deadly force was justified.

In response, the Rockwells argue that the officers' use of deadly force contravenes the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1 (1985). In *Garner*, the Court held that it was unreasonable for a police officer to use deadly force to prevent the escape of a suspect when the suspect did not pose an immediate threat to the officer or other persons. *Id.* at 11–12. In that case, the suspect was not armed, not known to be dangerous, and fleeing. By

7

contrast, the officers in this case confronted the polar opposite set of facts: Scott was armed with two eight-inch knives; the officers knew that he suffered from mental-health problems, had previously exhibited violent behavior, and was pounding on the walls of his room and yelling obscenities at the officers; and when he was shot, Scott was not fleeing from the officers, but running toward them. Accordingly, the holding in *Garner* is not controlling.

Second, the Rockwells contend that the magistrate judge's reasoning ignores the test set forth in *Graham v. Connor*. 490 U.S. 386. In *Graham*, the Supreme Court explained that in deciding if a particular seizure is reasonable, courts must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The Rockwells suggest that the magistrate judge gave too little weight to the minor nature of the crime that Scott had allegedly committed—misdemeanor assault by threat—and the fact that Scott was not attempting to evade arrest by flight. But neither the Supreme Court nor this Court has ever held that *all* of the *Graham* factors must be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others.

Third, the Rockwells urge this Court to view the officers' breach of the locked door to Scott's room as the actual moment of the use of deadly force because it "carried a substantial risk of causing serious bodily harm" and was the immediate but-for cause of the resulting altercation between Scott and the officers. Under this construction, the officers would not have been justified in using deadly force because, at the time of the breach of the door, Scott was barricaded in his room and could not have physically harmed the officers. But a breach of a door, in and of itself, does not create a substantial risk of serious

No. 10-11053

bodily harm, and the Rockwells have failed to present any Supreme Court or Fifth Circuit case that draws the concept of "deadly force" so broadly. In addition, the Rockwells' argument that the breach of the door necessarily caused the shooting that followed is nothing more than speculation. Thus, the magistrate judge correctly found that the "breach of the door was neither the moment where deadly force was employed nor did Scott's death result directly and only from the breach of the door."

Lastly, the Rockwells, relying on case law from other circuits, urge this Court to examine the circumstances surrounding the forced entry, which may have led to the fatal shooting, in evaluating the reasonableness of the officers' use of deadly force. This argument is unavailing. It is well-established that "[t]he excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]." *Bazan*, 246 F.3d at 493. At the time of the shooting, Scott was engaged in an armed struggle with the officers, and therefore each of the officers had a reasonable belief that Scott posed an imminent risk of serious harm to the officers. We need not look at any other moment in time.

Accordingly, the officers' use of deadly force was objectively reasonable. Because we hold that Scott's Fourth Amendment right to be free from the use of excessive force was not violated, we need not consider the issue of whether that right was clearly established. *See Brown*, 623 F.3d at 253.

## B. Assault and Battery

Second, regarding the assault-and-battery claims, the Rockwells argue that the district court erred in granting summary judgment in favor of the officers on the basis of state-law official immunity. In Texas, "to prevail on a claim for civil assault, the plaintiff must establish the same elements required for criminal assault." *Appell v. Muguerza*, 329 S.W.3d 104, 110 (Tex. App.—Houston [14th Dist.] 2010, pet. filed) (citation omitted). Accordingly, "a

9

person commits civil assault if he 'intentionally, knowingly, or recklessly causes bodily injury to another.'" *Id.* (quoting Tex. Penal Code Ann. § 22.01(a)(1)). "A person also commits civil assault if he 'intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.'" *Id.* (quoting Tex. Penal Code Ann. § 22.01(a)(3)).

Official immunity "is an affirmative defense"; it protects government employees "from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 2004) (citation omitted). The only question in this case is whether the Garland police officers acted in good faith. The test for good faith is "derived substantially" from the test for qualified immunity under federal law. *Id.* at 656; *see also Meadours v. Ermel*, 483 F.3d 417, 424 (5th Cir. 2007) ("The 'good faith' test applied by Texas law in determining official immunity is evaluated under substantially the same standard used for qualified immunity determinations in § 1983 actions."). The main difference, however, is that official immunity does not incorporate the requirement that the right alleged to have been violated be clearly established. *Cantu v. Rocha*, 77 F.3d 795, 808–09 (5th Cir. 1996) (citing *Chambers*, 883 S.W.2d at 657). Rather, Texas's good-faith test "focuses solely on the objective legal reasonableness of the officer's conduct." *Id.* at 809 (citing *Chambers*, 883 S.W.2d at 656–57).

Therefore, to prove their good faith, the officers in this case must show that "a reasonably prudent officer, under the same or similar circumstances, *could* have believed" that the decision to use deadly force against Scott was justified. *Chambers*, 883 S.W.2d at 656 (emphasis added). To controvert the officers' summary-judgment proof on good faith, the Rockwells "must do more than show that a reasonably prudent officer could have [acted differently];

[instead, they] must show that no reasonable person in the [officers'] position could have thought the facts were such that they justified [the officers'] acts." *Id.* at 657 (citations and internal quotation marks omitted).

As explained above, the officers' use of deadly force against Scott was objectively reasonable under the totality of the circumstances. Therefore, we affirm the district court's grant of official immunity to the officers on the Rockwells' assault-and-battery claims.

## C.    Unlawful Entry

Third, the Rockwells contend that the district court erred in granting summary judgment in favor of the officers on the unlawful-entry claims. In essence, the Rockwells argue that the officers' breach of Scott's door constituted an independent violation of Scott's rights under the Fourth Amendment. Specifically, the Rockwells claim that the officers violated (i) Scott's right to be free from warrantless entry to arrest for a misdemeanor and (ii) Scott's right to be free from a warrantless misdemeanor arrest. We hold that the officers are entitled to qualified immunity on all of the Rockwells' unlawful-entry claims.[2]

### 1. Warrantless Entry

Under the Fourth Amendment, a warrantless intrusion into a person's home is "presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify" the intrusion. *Gates*, 537 F.3d at 420 (citations and internal quotation marks omitted). "Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* at 421 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

On the issue of consent, we find that Scott did not consent to the warrantless entry of his room. To be sure, the officers argue that Scott

---

[2] We also reject the Rockwells' claim that the officers' entry violated article 15.25 of the Texas Code of Criminal Procedure. That provision is inapplicable to this case.

11

consented to the warrantless entry when he told the officers to "come on in," and that it was reasonable for the officers to believe that this statement constituted effective consent.    But this argument relies on a deceptively selective presentation of the facts.  Scott made the statement "come on in" in the middle of a tirade that also contained obscenities, threats, provocations, incoherent yelling, and several inconsistent statements with respect to consent.[3]    In addition, despite Scott's purported consent, he never unlocked the door to his room; his actions were in direct conflict with the consent the officers claim he gave.  We conclude that no reasonable officer could have believed that Scott had given his consent.  *See, e.g.*, *United States v. Kelly*, 913 F.2d 261, 266–67 (6th Cir. 1990) (explaining that words of consent are likely ineffective when they are coupled with inconsistent statements, or accompanied by the withholding or denial of the means of effectuating that consent).

On the issue of exigent circumstances, however, we conclude that the law at the time of the entry did not clearly establish that the officers were unreasonable in believing that *the threat Scott posed to himself* constituted an exigent circumstance.[4]  As noted, Scott had been diagnosed as suicidal and had attempted suicide on more than one occasion, suffered from schizophrenia and bipolar disorder, and at the time of the incident, had not taken his medication for several days.  When the officers asked Mrs. Rockwell what Scott would likely do if they were to leave without detaining Scott, she answered that she did not know.  Meanwhile, Scott had barricaded himself in his room, and his mental

---

[3] A few examples: "Fuck you.  I ain't opening shit."  "Fuck you.  You ain't my boss.  I ain't scared of you. . . . Come in here.  I'm ready for y'all."  "Bring it on, I ain't no chump."

[4] *See Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997) ("[W]here the complained of conduct is a law enforcement warrantless search of a residence, qualified immunity turns not only on whether it was then clearly established that such a search required probable cause and exigent circumstances, but *also* on whether it was then 'clearly established that the circumstances with which' the officer 'was confronted did not constitute probable cause and exigent circumstances.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987)).

No. 10-11053

instability was becoming increasingly apparent as he pounded the walls, shook the door, and hurled foul threats at the officers.

Only a handful of courts of appeals and district courts have addressed whether the threat a suspect poses to himself may constitute an exigent circumstance; each of these courts concluded either (i) that the threat the suspect posed to himself *did* constitute an exigent circumstance[5] or (ii) that the issue was not clearly established.[6] None of these courts concluded that the threat the suspect posed to himself did *not* constitute an exigent circumstance. *Cf. Russo*, 953 F.2d at 1044 (noting that the court (i.e., the Sixth Circuit) was not aware of "a single case indicating that an officer's attempt to rescue what the officers believes to be a suicidal person does not constitute exigent

---

[5] *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043–44 (6th Cir. 1992) (holding that officers were entitled to qualified immunity on plaintiffs' warrantless-entry claims, and that plaintiff had failed to show that exigent circumstances did not exist under clearly established law, where suspect was mentally disturbed and possessed two knives, radio call had described suspect as suicidal, and suspect had turned out lights and gone silent immediately before officers' decision to enter); *DuVall v. City of Santa Monica*, 42 F.3d 1399, 1994 WL 684501, *1 (9th Cir. 1994) (mem.) (unpublished) (concluding that exigent circumstances justified warrantless entry where officers knew that suicidal man inside his trailer home was armed and had threatened to kill himself, because "officers reasonably feared for [suicidal man's] safety as well as that of neighbors and themselves"); *Conway v. Battelle*, No. 4:04-CV-569, 2006 WL 897142, *12 (E.D. Mo. Mar. 30, 2006) (concluding that exigent circumstances justified warrantless entry because "an objectively reasonable officer at the scene could have believed that lives within the residence, including the suicidal subject and the distraught woman, were threatened and thus that immediate police action was necessary"); *Sepatis v. City & Cnty. of S.F.*, 217 F. Supp. 2d 992, 1000 (N.D. Cal. 2002) ("Exigent circumstances may exist where a party appears to be suicidal."); *Adams v. Mustang Police Dep't*, No. 07-CV-1113, 2009 WL 152580, *8 (W.D. Okla. Jan. 21, 2009).

[6] *Roberts v. Spielman*, 643 F.3d 899, 906 (11th Cir. 2011) (holding that officer was entitled to qualified immunity because plaintiff had "cited no binding authority that clearly established that probable cause and exigent circumstances immediately evaporate once an officer performing a welfare check for a possibly suicidal person sees that the person is alive"); *Escobedo v. City of Fort Wayne*, No. 1:05-CV-424, 2008 WL 1971405, *41 (N.D. Ind. May 5, 2008) ("The Plaintiff does not cite any case indicating that a suicidal person, like Escobedo, does not create exigent circumstances. Nor does she point to any closely analogous case.").

circumstances").[7]   Furthermore, this Court has come close to addressing the issue only once before, in an unpublished opinion and without elaboration. *See United States v. Butler*, 209 F.3d 719, 2000 WL 284027, *1 (5th Cir. 2000) (per curiam) (unpublished) ("Harris County Sheriff's Department Deputies lawfully entered Butler's residence either because of the exigent circumstances presented by his girlfriend's alleged attempted suicide or because Butler gave them consent to enter the house and go up to the bedroom.").

In light of the above case law and the overall dearth of binding Supreme Court and Fifth Circuit case law directly on point, we conclude that, at the time of the incident in this case, it was not clearly established that it was unreasonable for the officers to believe that the threat Scott posed to himself constituted an exigent circumstance.  Consequently, we hold that the officers are entitled to qualified immunity on the Rockwells' claim for warrantless entry.

### 2. Warrantless Arrest

The Rockwells also claim that the officers had no probable cause to arrest Scott for a misdemeanor because the officers had not personally witnessed the crime.  As noted, at one point during the evening, before the officers arrived at the scene, Scott emerged from his room and raised his fist as if to hit his mother. Although the officers did not personally witness this misdemeanor, the officers' attempted arrest of Scott for a misdemeanor was not clearly unlawful under the circumstances.  At the time of the incident in 2005, the law was not clearly established on whether a warrantless arrest for a misdemeanor not committed in the presence of the arresting officer violates the Fourth Amendment.  Indeed, just one year before the incident, in an unpublished decision from 2004, this Court held that the Supreme Court had yet to "specifically consider[ ]" the issue. *United States v. Williams*. 111 F. App'x 221 (5th Cir. 2004).  Because the law at

---

[7] *See also Ewolski v. City of Brunswick*, 287 F.3d 492, 505 (6th Cir. 2002) (reaffirming *Russo* and stating that the court "is not aware of any such case that has issued since *Russo*").

the time of the incident was unsettled, the officers are entitled to qualified immunity on the Rockwells' claim for warrantless arrest.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on all claims.

AFFIRMED.

No. 10-11053

HAROLD R. DeMOSS, JR., Circuit Judge, specially concurring:

We hold today that the six police officers who breached Scott Rockwell's bedroom door and ultimately shot him to death are entitled to qualified immunity under federal law and official immunity under Texas state law. Noting that the state of the law in these particular circumstances remains relatively primitive, I join the majority opinion in full. I write separately to express disapproval of and disappointment with the officers' actions during the course of this sad incident.

The salient facts are these. The first officer arrived at Scott's residence at 8:45 p.m. and five other officers arrived in the next few minutes. They knew that Scott was a bipolar schizophrenic; that he was off his medication and perhaps on illegal drugs; that he had threatened his parents in the past and he had done so again that night; and that he had been taken into custody in the past. Yet they also knew that they had not witnessed him commit a crime; that he had not harmed anyone; that his parents did not want him arrested that night or harmed in any way; and that he had locked himself inside of his own room away from his parents and any other person. While the officers knew he had attempted suicide in the past, they had no indication that he intended on hurting himself that night or that he had knives in his room. Nevertheless, less than 30 minutes after the first officer arrived at the residence, Scott lay dying from four gunshot wounds.

It is undisputed that Scott was in no position to harm any other person while locked in his bedroom. Yet the officers escalated the situation before even 30 minutes had passed by breaching his bedroom door without a warrant and with firearms drawn. As I see it, they provoked a man they knew to be mentally ill into a violent reaction. They did not allow for any time to defuse the situation or implement the safest procedures possible to take him into custody. Preventing a possible suicide is a worthy goal, but an armed

16

entry that heightens the risk to the potential victim's life certainly is not the best way to accomplish that goal.

Patience, judgment, and discretion are highly important virtues for law enforcement personnel to possess; in my judgment the officers exercised none of them in this case. While their conduct is not legally actionable, neither is it admirable. I urge the City of Garland police department and other law enforcement agencies to better prepare officers for foreseeable volatile situations involving mentally ill citizens and to practice negotiation techniques or less-than-lethal arrest procedures that will not needlessly risk the lives of those who seem to be mentally unable to control themselves.[8] Insanity is a defense our legal system offers to mentally ill defendants; it is not an invitation for law enforcement personnel to take unnecessary actions that heighten the risk of harm or death to mentally ill suspects.

Scott's mental illness certainly added a tragic dynamic to his life, but it did not need to cause his death. In my opinion, the officers should have been trained to use better judgment in their approach to volatile and unfortunate situations such as this one. This entire case should have been avoided. Scott should be alive today—perhaps in a medical facility or under court supervision, but alive nonetheless. All this being said, the majority is correct in its legal judgments. As such, I concur.

---

[8] More effective and less lethal methods of capture and control are currently used in prisons and with wild animals—e.g., protective shields or police gear, nets, tranquilizers—and should also be options in situations such as these.