# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 12, 2014

Lyle W. Cayce
Clerk

No. 13-30337

TYRALYN HARRIS, individually and on behalf of her minor children, Jai Harris and Jalen Aubert; SHANNON GRACE, individually and on behalf of her minor child, Branin Harris; BRIAN JOURDAN; BRIANIKA JOURDAN,

Plaintiffs - Appellants

v.

RONAL SERPAS; STEPHEN MCGEE; CITY OF NEW ORLEANS, through Mayor Mitchell Landrieu; JAMES KISH; JONATHAN PARKER; STUART SMITH; ERIC GEISLER,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, CLEMENT, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

On the evening of April 9, 2010, five police officers from the New Orleans Police Department (NOPD) arrived at Brian Harris's home after his former wife called 911 when she feared Brian had possibly ingested an overdose of sleeping pills. Mr. Harris had committed no crime and the officers were not there to place him under arrest. After breaching the barricaded door to his bedroom, the officers shot and killed Mr. Harris when he raised a knife above his head and advanced toward them. Mr. Harris's surviving children filed suit against the officers for excessive force in violation of the Fourth Amendment

No. 13-30337

and sued the City of New Orleans under a *Monell* theory.  The district court granted summary judgment for the officers on the basis of qualified immunity and dismissed the claim against the City.  We AFFIRM the district court's opinion for the following reasons.

## FACTS AND PROCEDURAL HISTORY

At the time of this incident, Brian Harris was in his bedroom at his home, where he lived with his former wife, Tyralyn Harris, and two children, Jalen Aubert and Jai Harris.  On April 9, 2010, Tyralyn became concerned about Brian's well-being, as he was depressed after recently losing his job. That night, Brian locked himself inside their bedroom and Tyralyn believed he may have taken an overdose of sleeping pills in an effort to take his own life. Fearing for Brian's life, Tyralyn called 911 for help.

NOPD Officers Stephen McGee, Jonathon Parker, and James Kish responded to the call, along with Sergeants Stuart Smith and Eric Geisler. When the officers arrived at about 10:22 p.m., Tyralyn met the officers in front of the house, and explained to them that she believed Brian may have taken an overdose of sleeping pills.  She did not express any fear for her own safety or that of their children, but she was worried that Brian may hurt himself.  She also told the officers that Brian did not have a gun, but may have a folding knife with him that he usually carried due to his former job as a welder. Tyralyn then gave the officers a set of keys to the bedroom door where Brian had locked himself in.

The officers carried two tasers that included small camera devices, which recorded audio and video.  The first video shows one of the officers, Sergeant Smith, ordering the other officers to line up outside Brian's bedroom door, stating that "I want one gun and one taser right here."  An officer called out the name "Brian" and got no response. When the officers unlocked the door, they found it was barricaded by a large dresser that had been moved into the

2

path of the doorway.  The video shows the officers forcing the door open, calling out "Brian" and then entering the room.  The officers found Mr. Harris lying on his back in his bed under a blanket, not moving.

Upon entering his bedroom, the officers began to give verbal commands, demanding to see Mr. Harris's hands.  When Mr. Harris did not respond, Officer McGee removed his blanket revealing Mr. Harris, who was dressed in under shorts and a tank top, lying on his bed.  Mr. Harris was holding a folding knife in his right hand.  The officers began yelling for him to "put it down, put it down!  Put down the knife!"  Mr. Harris, while still lying in his bed, crossed his arms and responded, "It's not coming down."  Mr. Harris continued not to comply with the officers' requests to put the knife down, and Sergeant Smith then ordered Officer Kish to "tase him."  Officer Kish deployed his taser at Mr. Harris, who was still lying in his bed at this point, about 26 seconds after the officers first entered the room.  One of the two steel darts that Officer Kish shot at Mr. Harris missed him, and it appears that no shock was administered.

The next taser video lasts only six seconds.  As it begins, Mr. Harris is already standing up and Officer Parker is using the second taser on him.  Mr. Harris stood up out of his bed after the first taser attempt, and he appears agitated at this point.  Officer Parker's second taser attempt apparently failed to work as well because Mr. Harris was not incapacitated.  At this point, Mr. Harris began flailing his arms at the taser wires, and raised the knife above his right shoulder in a stabbing position.  An officer yelled "Drop the knife" to which Mr. Harris responded "I'm not dropping nothing."  The next instant, gun shots rang out on the video, as Officer McGee fired three bullets at Mr. Harris with a departmentally-issued Glock Model 22 semi-automatic handgun.  Two of the bullets hit Mr. Harris in the torso, and the third in his thigh.  Mr. Harris slumped to the floor at that point, and the second video ends.  Mr. Harris was transported to University Hospital, where he died from the gunshot wounds.

No. 13-30337

Tyralyn Harris filed suit in the Eastern District of Louisiana, on behalf of herself and her minor children.[1] The Plaintiffs filed suit under 42 U.S.C. § 1983, contending that the officers used excessive force in violation of Mr. Harris's Fourth Amendment rights. They also contended that the City of New Orleans is liable under *Monell*, alleging that the City's inadequate policies and training procedures led to Mr. Harris's death.[2] The district court found that the use of deadly force was not unreasonable and granted the officers' motion for summary judgment on the basis of qualified immunity. As such, the district court dismissed the *Monell* claim, and granted summary judgment in favor of the City of New Orleans. Plaintiffs timely appealed.

## STANDARD OF REVIEW

"This court reviews *de novo* the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity." *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007). "[S]ummary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). "A genuine issue of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party." *Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc.*, 292 F.3d 471, 478 (5th Cir. 2002). In reviewing a motion for summary judgment, this Court views "the facts and inferences to be drawn

---

[1] Mr. Harris's other former wife, Shannon Grace, joined as a plaintiff on behalf of herself and the children she had with Mr. Harris. Upon a motion raised by the defendants, the district court determined that both Tyralyn Harris and Shannon Grace did not have standing to pursue any survival claims on behalf of Mr. Harris, as neither of them were married to Mr. Harris at the time of his death. Mr. Harris's children were permitted to proceed as plaintiffs in this suit.

[2] Plaintiffs also sought relief under Louisiana's wrongful death and survival statutes, but the district court declined to exercise jurisdiction over these state law claims.

therefrom in the light most favorable to the non-moving party." *Id.*  However, when there is video evidence available in the record, the court is not bound to adopt the nonmoving party's version of the facts if it is contradicted by the record, but rather should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also Carnaby v. City of Houston,* 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

## DISCUSSION

"Qualified immunity protects officers from suit unless their conduct violates a clearly established constitutional right." *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003).  Once the defendant raises the qualified immunity defense, "the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (quoting *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)).  "Claims that law enforcement officers used excessive force are analyzed under the Fourth Amendment." *Mace*, 333 F.3d at 624 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

"This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity." *Freeman*, 483 F.3d at 410. First, this Court must determine "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." *Id.* "If so, we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* at 410–11.  "To prevail on an excessive force claim, a plaintiff

must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008) (internal quotations and citations omitted).

The reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The defendants conceded that Brian Harris was not being placed under arrest for any suspected crime. Therefore, the only applicable factor under *Graham* is whether Brian Harris "posed an immediate threat to the safety of the officers or others." *Id.* The "[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Mace*, 333 F.3d at 624.

### A. Excessive Force Claim

Appellants argue that taken as a whole the officers' actions in this case were unreasonable. To the extent that Brian Harris became agitated and threatening, Appellants contend, it was only due to the provocation of the officers. Appellants point to the officers' awareness that Brian had not threatened his wife or children, and that they were only called to the home to assist Brian, who was depressed and had possibly taken an overdose of sleeping pills. Brian was engaged in lawful activity before and during the incident, Appellants contend, up until the officers roused him from his bed by breaching his bedroom door yelling commands and firing taser darts at him seconds later. Accordingly, Appellants assert that under the totality of the circumstances, the officers' use of force was unreasonable.

No. 13-30337

The United States Supreme Court has long held that courts must look at the "totality of the circumstances" when assessing the reasonableness of a police officer's use of force. *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). This Court, however, has narrowed that test, holding that "[t]he excessive force inquiry is confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting.*" Bazan*, 246 F.3d at 493. Therefore, any of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit.

This Court recently issued a published opinion that is analogous to the instant case. In *Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011), a mother called 911 for assistance in helping her 27-year-old son get to a mental health facility during a mental health crisis. *Id.* at 989. After making repeated unsuccessful attempts to convince the son to come out of his bedroom, the police decided to breach the door. *Id.* Once the door was breached, the officers found the mentally unstable son holding two eight-inch serrated knives, and after he rushed towards the police officers and a struggle ensued, the officers fired their weapons and killed him. *Id.* at 989–90. On appeal to this Court, the plaintiffs in *Rockwell* argued that the officers' breach of the locked door to their son's room should be included in the reasonable use of deadly force inquiry, contending that the officers' actions "carried a substantial risk of causing serious bodily harm and was the immediate but-for cause of the resulting altercation between [their son] and the officers." *Id.* at 992 (internal quotation marks omitted). In rejecting this argument, the Court explained,

> It is well-established that "[t]he excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]." *Bazan*, 246 F.3d at 493. At the time of the shooting, [the Plaintiffs' son] was engaged in an armed struggle with the officers,

7

and therefore each of the officers had a reasonable belief that [he] posed an imminent risk of serious harm to the officers. We need not look at any other moment in time.

*Id.* at 992–93 (emphasis in original).

In the instant case, the taser video evidence confirms that Mr. Harris was holding a knife above his head at the moment Officer McGee fired his weapon. Notwithstanding, Appellants argue that the district court erred by "making a finding of fact that [Officer] Kish was in imminent danger of being stabbed by an advancing Brian Harris" at the time of the shooting. Appellants contend that the parties' locations and movements in the room at the time of the shooting is a "hotly contested" material factual issue that precludes summary judgment.

The relevant law, however, does not require the court to determine whether an officer was in actual, imminent danger of serious injury, but rather, whether "the officer reasonably believe[d] that the suspect pose[d] a threat of serious harm to the officer or to others." *Rockwell*, 664 F.3d at 991 (internal quotations and citations omitted). Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. When looking at the "moment of the threat" that resulted in Officer McGee's use of deadly force, it is clear from the taser video that Mr. Harris was standing up out of bed and had raised the knife above his head at the time the shots were fired. Accordingly, the district court properly held that under these circumstances, the officers reasonably feared for their safety at the moment of the fatal shooting.

### B. Warrantless Entry Claim

Appellants also argue that the officers violated Brian Harris's Fourth Amendment rights when they forcibly entered his bedroom without a warrant.

No. 13-30337

This Court has previously held that "it is well established that the police may conduct a warrantless search of an area without running afoul of the Fourth Amendment if a third party with common control over the area consents to the search." *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002) (internal quotation marks and citation omitted). Since Tyralyn Harris consented to the officers' entry by giving them the keys to the bedroom, in a home that she co-occupied with Brian, Appellants have not shown that there was any Fourth Amendment violation. Therefore, it is not necessary to reach Appellants' alternative argument regarding whether Mr. Harris's possible suicide attempt constituted exigent circumstances justifying a warrantless entry into his bedroom.

### C. *Monell* Claim

"To hold a municipality liable under [42 U.S.C.] § 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009). Since Appellants have not shown that there was a constitutional violation in this case, the district court properly dismissed the *Monell* claim against the City of New Orleans.

### CONCLUSION

We affirm the district court's opinion based solely on our examination of the moment when the fatal shooting occurred. We express no opinion regarding the appropriateness of the officers' conduct that preceded the moment of the shooting in this case.

In summary, the taser video evidence confirms the district court's finding that Brian Harris was holding a knife in a stabbing position at the moment of the fatal shooting. Therefore, the district court properly concluded that the

No. 13-30337

use of deadly force was not unreasonable.  Accordingly, we AFFIRM the district court's grant of summary judgment for the officers based on qualified immunity.  As such, we also AFFIRM the dismissal of the *Monell* claim against the City of New Orleans.