PATRICK E. HIGGINBOTHAM, Circuit Judge,
concurring in part and dissenting in part:
As Quamaine Mason and his girlfriend, Racquel Babino, stepped outside of her apartment, they were met by three officers with guns drawn. Quamaine put his hands up and stood still. Officer Martin Faul and his police dog together attacked Qua-maine, Faul shooting him seven times at point-blank range as he fell down struggling to fend off the dog. No other officer fired a shot. I concur in the rejection of immunity for the final two shots and the disposition of Appellants’ other claims, but I dissent from the majority’s refusal to address the district court’s grant of qualified immunity for the first five shots that led to Quamaine’s senseless death.
*283 I.
Accepting the version of facts most favorable to Appellants, as we must,[1] I offer a narrative of events from which a reasonable jury could find that no reasonable police officer could have perceived an imminent threat to his own life or the life of another.
On December 9, 2011, Officer Martin Faul — a canine officer — was working the night shift. Responding to a reported armed robbery at a department store, Officer Faul heard a report of another armed robbery at Racquel Babino’s apartment complex. Officer Faul immediately “volunteered for the call.” Arriving on the scene at the same time as two other officers, all three officers ran toward the apartment with guns drawn. When the . other officers gained the lead, he quickly took charge, yelling, “Y’all behind the dog.”
The officers arrived at the apartment complex to see Quamaine Mason walking out the front door of an apartment with a young woman. Quamaine matched the description of the suspect, and the police call had stated that he was armed.[2] When the officers saw him, he was not fleeing or threatening anyone; he was walking quietly out the front door with a female companion. The young woman with him, upon seeing the police officers with already-drawn weapons, immediately shouted out that Quamaine had done nothing wrong. Quamaine, who wanted to be a police officer and was actively applying to agencies in the area, had a gun on his waistband. He had a permit to carry this gun.[3]
Quamaine stood still with his hands up and empty, complying with all police instructions.[4] But holding his dog by its collar, Officer Faul and the dog charged Quamaine — the two were separated by less than the length of the dog’s thirty-six-inch tether. Officer Faul shouted “Gun!,” and launched the dog onto Quamaine. When the dog hit Quamaine, he began falling to the ground reflexively trying to fend off the attack with his hands. As Quamaine fell, Officer Faul began shooting him. Indeed, Officer Faul began firing nearly simultaneously with his deployment of the dog, which continued attacking throughout the shooting. This means that Officer Faul was firing at point-blank range and that the assault was of man and dog, not dog then man. Neither of the other two officers on the scene fired a single shot.
The autopsy confirms that the paths of the shots which hit Quamaine are explained only by his struggle with the dog as he falls to his left and to the ground. None of the seven shots hit Quamaine head-on, instead striking him in downward paths from the side and back.. The closest to head-on is the shot which hit Qua-maine’s chin at a sharp downward angle, then traveled through his neck (never exiting his body) to his chest. Dr. Traylor, *284 who gave a “plausible order of shots fired based on the [witness] statements,” believed this shot was the first to hit. However, this account is contradicted by other evidence;[5] indeed, Babino stated that she believed the first shot hit Quamaine’s chest or shoulder rather than his chin. Whenever the chin shot struck, its downward trajectory can be explained only by Qua-maine’s struggle with the dog.
While the dog was on Quamaine, Officer Faul shot Quamaine seven times at pointblank range (recall that the dog was on a thirty-six-inch tether held by Officer Faul’s left hand and his gun was being fired with his right). If Quamaine did move on the ground prior to Officer Faul firing the last two shots, it may have been due to the dog, which was still “tearing at” Qua-maine’s hip, “grabbing him and pulling him back.” However, there is evidence that Quamaine did not move during the pause between the first five and the last two shots to hit him. Babino’s deposition indicates that her attention was fixed on Qua-maine throughout the shooting, and officer accounts provide further support — she was watching Quamaine. When asked if she saw Quamaine move once he was on the ground, she stated that he picked up his head, but she did not see him “move his body, the trunk of his body.” She also stated that she did not see Quamaine make “any threatening action ... towards anyone” once the apartment door opened or make “any effort whatsoever :.. to fight back against the police.”[6]
Officer Galland reported that Quamaine made a rolling motion similar to that reported by Officer Faul, but only after all the shots were fired, and stated that Qua-maine’s hands were above his head at the time — suggesting that Officer Faul’s time-line might be mistaken. Finally, if the last two shots hit Quamaine’s back, as suggested by testimony from Officer Faul and another witness, then both his humeri were already fractured by the point at which Officer Faul reports that he tried to spin himself over. Though he may still have been able to move his arms, “it would have been extremely painful” and they were “not going to help him at all” to turn over. As the majority correctly concludes, a reasonable trier of fact could find that Quamaine never moved threateningly once on the ground.[7]
II.
A.
“[W]hen reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts.”[8] On the narrative sketched above, Officer Faul and the dog together attacked Quamaine even though the young man made no threatening movement whatsoever. Even if Officer Faul actually believed Quamaine was going to fight him— *285 despite his complete compliance and facing three drawn guns — no reasonable police officer could perceive such behavior as life threatening. There is no doubt that Officer Faul’s' use of lethal force in these circumstances violated the Fourth Amendment. “Where the suspect poses no imme-. diate threat to the officer and no threat to others,” the use of deadly force is not justified.[9] We also “need not dwell” on the issue of qualified immunity. “It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a ... felon who does not pose a sufficient threat of harm to the officer or others.”[10]
The majority fully agrees with this analysis with respect to the final two shots, but it leaves the district court’s grant of summary judgment in place with respect to the first five shots — refusing to address the appeal from that judgment. That is, it leaves Officer Faul entitled to qualified immunity for these shots, electing to “remand for consideration in the first instance whether Officer Faul’s other actions are entitled to qualified immunity in the light of Babino’s testimony” — without vacating the grant of summary judgment. With all due respect, this result is ás inexplicable as it is unexplained. The district court concluded that Officer Faul was entitled to qualified immunity for all seven shots — it has already addressed “in the first instance” whether Officer Faul is entitled to qualified immunity for the first five shots “in the light of Babino’s testimony.” Moreover, this partial remand cannot be squared with the fact that the majority does address the final two shots, where Babino’s testimony was critical. I am at sea as to why the majority slices a single event into distinct segments — seven shots into five and two — then performs the proper analysis with respect to one segment— the final two shots — and then orders the district court to try again with respect to the other segment — the first five shots. This decision is especially puzzling when the issue is qualified immunity. As we have said before in this context, there is no reason to require the district court to address again a legal question that this Court reviews de novo.[11] And we inevitably will face another appeal before this case can go to trial, at which evidence offered to the jury can hardly be segmented.
The upshot is that the majority simply declines to “express an opinion” with regard to a legal issue — the main issue of this case — that was squarely addressed by the district court, fully briefed by the parties, and remains the heart of this case. The majority also declines to vacate the district court’s judgment with respect to the first five shots. To these eyes, that is indefensible.[12] Nowhere in its opinion *286 does the majority explain from where it derives the authority to slice a single event and choose from the resulting parts of the appeal which to decide. We are duty-bound to decide the issues essential to the appeal. “Federal appellate courts’ twin duties are to decide appeals and to articulate the law.”[13] The majority’s opinion does neither with respect to the first five shots and complicates the future path of this case. One thing is sure — long delay in a trial that the majority has already conceded must occur.
B.
Whatever the majority’s reasoning, and with all due respect, I cannot concur in its opinion leaving the door open for another decision in Officer Faul’s favor. This “remand for consideration” implicitly holds that on this record the district court could conclude that Officer Faul enjoys qualified immunity as a matter of law for the first five shots and to these eyes that cannot be so. Appellees rely upon the principle that officers may use deadly force when threatened even if they negligently create circumstances leading to the need for force.[14] That is, Appellees argue that Officer Faul was justified in using deadly force because even if he negligently released his attack dog, Quamaine reacted — in a reflexive attempt to fend off the dog — by moving his hands downward and unintentionally closer to the gun in his waistband. But that principle does not address the situation here, where an officer used both a dog and a gun together as part of the same attack, the same direct and intentional deployment of deadly force.
The doctrine regarding negligent creation of the circumstances requiring deadly force is necessary to avoid collapse of the jurisprudence of deadly force into a negligence action, but it is not without limit — for it would then blur and ultimately erase the effort of the law to limit the use of deadly force. And I do not read the extant cases to say otherwise. In Young, the officer negligently increased the background level of risk by failing to maintain cover, failing to radio for help or wait for backup, placing his patrol car in a dangerous position, and directing the suspects to exit their car.[15] We have followed Young in cases where officers failed to maintain cover,[16] failed to identify themselves as officers,[17] or otherwise increased the riskiness of the situation.[18] Also following Young, we have said that “[t]he excessive force inquiry is confined to whether the [officer] was in danger at the moment of *287 the threat that resulted in” the force, but we immediately continued that earlier events “set the stage for what followed” and held that factual disputes regarding them were material.[19]
Excessive force cases are highly fact specific, and two key circumstances distinguish this case from Young and its progeny. First, the officer’s use of the dog to attack Quamaine did not merely set a risky scene before shots were fired. It was at all times an assault of dog and gun. The moment the dog did as trained, Officer Faul began firing away. That he continued to put two more rounds in his back after Quamaine was lying on his stomach is doubly relevant. It signifies both as an independent act, as the majority observes, but also for its powerful suggestion that Officer Faul intended his force to be deadly from the beginning.[20] Officer Faul’s multiple breaches of police protocol — including “rush[ing] into ... the killing zone” without a plan, failing to take cover, and insisting on taking the lead despite being tethered to an attack dog — suggest the same. Though Officer Faul cannot be held liable for these negligent actions, a jury could certainly infer that they paint the picture of an officer eager to engage in a deadly confrontation.
Second, in the Young cases, officers’ actions created risky situations, but the suspects then chose to commit intervening acts which threatened the officers.[21] The officers set the scene, but the tragic outcome was not inevitable; suspects were free to comply with officer commands[22]— but instead chose to attack, flee, or reach for objects out of officers’ view. Officers faced with these newly developed threats then responded reasonably in the moment. There was no intervening act in this case. To the extent Quamaine moved his hands, he cannot be faulted for reflexively attempting to protect himself from the dog. No reasonable officer would have perceived his reflexive movements as threatening. Indeed, given the firing sequence and trajectories, a reasonable jury could easily conclude that hand movement had nothing to do with this shooting.
Young and Ramirez do not provide an answer here. We have recognized that summary judgment is properly denied “where fact issues exist[ ] about whether a police officer’s use of force was justified or *288 was ‘unreasonably created.’ ”[23] Other circuits with rules similar to Young have recognized that officers may be liable for using excessive force when their actions cross the line from negligence to recklessness.[24] Still others have recognized the principle that officers may be liable for excessive force when their actions directly create the justification for the force. In Ribbey v. Cox, the Eighth Circuit held that a police officer cannot break a car window and then rely upon the suspect’s “reflexive] [movement] to protect himself from the breaking glass” to justify the use of lethal force.[25] In Estate of Starks v. Enyart, the Seventh Circuit held that a police officer cannot jump in front of a suspect’s car and then rely upon the danger of the oncoming car to justify the use of lethal force.[26] In Sample v. Bailey, the Sixth Circuit held that a police officer cannot order a suspect to get out of his hiding place and then rely upon the suspect’s efforts to comply with that command to justify the use of lethal force.[27] And in Kopf v. Wing, the Fourth Circuit held that a police officer cannot deploy a dog and then rely upon the inability of the suspect to put his hands up as the dog attacks him to justify the use of force.[28]
These cases chart a limit to Young comporting with common sense. At some point, an officer crosses the line between setting, up a risky situation and actually himself directly causing the “threat.” Officers are at risk in nigh every traffic stop as they approach a vehicle, as are the persons in that vehicle — so also with street confrontations. Yet no one will maintain that an officer can lawfully avoid all risk by simply shooting and asking questions later. So long as the suspect has his hands in the air — and certainly when three officers have drawn guns trained on him— an officer cannot simply shoot him, avoiding all risk to himself. If that is so, an officer cannot knock him down and shoot him because he then no longer has his hands up. That the officer has information that the suspect is armed does not work a different result.[29] To say otherwise is to hold that a deadly attack upon a man standing with his hands in the air is not .excessive force just because he has a gun in his waistband — an unconscionable result insupportable in law, and perversely *289 confounding the current sanctioning of open carry of handguns.
III.
Under Appellants’ version of the facts, there was nothing that Quamaine Mason or indeed anyone in the area matching his description could do to escape Quamaine’s fate. He was dead as soon as police were called. He complied with all orders until he was attacked by a dog and police officer who shot him seven times at point-blank range. We have the responsibility of providing arresting officers all guidance in the use of deadly force that we can, as these cases are often close and difficult — and when these cases are close and difficult, we clothe the officers with post-hoc immunity. This attack of man and dog is far from that genre. We ought not decide this case — that decision belongs to a jury. Avoiding a trial is an important component of qualified immunity, but denial of qualified immunity does not deny Officer Faul his immunity defense from liability. It only concludes that he must be judged by a jury of his peers.[30] Appellants should not have go through the time and expense of another interlocutory appeal to get this Court to recognize as much. I cannot join this newly minted form of abstention, and I respectfully dissent.

. See Ferraro v. Liberty Mut. Fire Ins. Co., 796 F.3d 529, 531 (5th Cir.2015).

. The characterization of the preceding incident as armed robbery was an error made by the dispatcher.

. Appellees represent that they performed a records search and were unable to find any evidence that Quamaine held a concealed weapons permit, Appellees’ Brief at 7, but at least two different people recall seeing documentation of this permit. Appellees also are not confident enough in their search efforts to represent that Quamaine definitely did not have such a permit. See id. ("[E]ven assuming arguendo that [Quamaine] held a valid permit....”). To the extent this fact is disputed, we must resolve the dispute in favor of Appellants. See Ferraro, 796 F.3d at 531.

.Babino also stated that Quamaine never did anything threatening, presumably including taking up a fighting stance.

. Dr. Traylor's version of the bullet’s trajectory as "slightly right to left" differs from the autopsy, which reported the trajectory as "left to right.”

. Babino here refers to all times after the first shot; she also stated Quamaine made no threatening movement prior to any shots.

. See Goodman v. Harris County, 571 F.3d 388, 398 (5th Cir.2009) ("Ashabranner’s testimony that Michael pushed him and attempted to drown Nero was contradicted by medical evidence and witness testimony that Michael's right arm was ‘virtually useless' due to a gunshot wound suffered only three months prior which had not yet healed.”); Sanchez v. Fraley, 376 Fed.Appx. 449, 452 (5th Cir.2010).

. Hill v. Carroll County, 587 F.3d 230, 234 (5th Cir.2009).

. Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

. Lytle v. Bexar County, 560 F.3d 404, 417 (5th Cir.2009); see also Graves v. Zachary, 277 Fed.Appx. 344, 349 (5th Cir.2008) ("It does not take a specific case for an officer to know that he cannot shoot a compliant suspect and that he cannot fire again at someone who is objectively 'downed or incapacitated.’ ”).

. See Nerren v. Livingston Police Dep’t, 86 F.3d 469, 473 n. 25 (5th Cir.1996); see also Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 263 (5th Cir.2005) ("While the normal procedure where the lower court has not considered a pertinent issue is to remand the case, considerations of judicial economy can dictate otherwise in circumstances such as these, where the issue is a purely legal question subject to plenary review by this court.”).

.When remanding because the district court committed a legal error, our uniform practice is to vacate the judgment. See, e.g., Veasey v. Abbott, 796 F.3d 487, 503-04 (5th Cir.2015); Alaska Elec. Pension Fund v. Flowserve Corp., *286 572 F.3d 221, 232 (5th Cir.2009) (per curiam); Gros v. City of Grand Prairie, 181 F.3d 613, 617 (5th Cir.1999). This is sensible. If the district court's judgment is predicated on an erroneous legal determination, we should not leave it in plage. If it is not, there is no basis to return a part of the case to the district court.

. United States v. McFarland, 311 F.3d 376, 417 (5th Cir.2002) (Jones, J., dissenting from the denial of rehearing en banc).

. See Young v. City of Killeen, 775 F.2d 1349, 1353 (5th Cir.1985).

. Id. at 1351.

. Carnaby v. City of Houston, 636 F.3d 183, 188 (5th Cir.2011).

. Fraire v. City of Arlington, 957 F.2d 1268, 1275-76 (5th Cir.1992).

. See Rockwell v. Brown, 664 F.3d 985, 992-93 (5th Cir.2011) (officers broke into room where upset, mentally ill man had barricaded himself); Ramirez v. Knoulton, 542 F.3d 124, 127, 129-30 (5th Cir.2008) (officer "fail[ed] to consider the use of non-lethal force or to employ a crisis negotiator” in response to a non-complying suspect); Owens v. City of Austin, 259 Fed.Appx. 621, 624 n. 2 (5th Cir.2007) (officer failed to follow proper procedures).

. Bazan ex rel. Bazan v. Hidalgo County, 246 F.3d 481, 493 (5th Cir.2001) (citing Fraire, 957 F.2d at 1276; and Young, 775 F.2d at 1353). But see Rockwell, 664 F.3d at 992-93 (refusing to consider circumstances leading to use of force).

. See Baker v. Putnal, 75 F.3d 190, 198 (5th Cir.1996) ("The nature of the wounds indicate that Baker, Jr., was not facing Putnal when he was shot. The number of shots and the nature of the wounds raise a serious question as to the reasonableness of his conduct, more of a question of fact than a court may dispose of on summary judgment.”).

. Young, 775 F.2d at 1351 (suspect who tried to flee scene of drug deal reached down into car when ordered to exit); Rockwell, 664 F.3d at 989-90 (suspect attacked officers with knives); Carnaby, 636 F.3d at 186 (suspect led police on car chase, refused to get out until police smashed a window, bent down in car where officers could not see hands, and then swung hands, one grasping something, toward officers); Fraire, 957 F.2d at 1275 (suspect fled from police in car, then defied police orders and drove straight at officer); Ramirez, 542 F.3d at 127 (suspect exited car holding gun and brought his hands together in front of his waist, all the time failing to comply with officer commands); Owens, 259 Fed.Appx. at 622-23 (suspect refused to allow himself to be handcuffed, then accelerated car with officer’s arms trapped inside so that officer was dragged along).

.Rockwell’s mental illness may have restricted his choices once cornered, but police did not. See Rockwell, 664 F.3d at 989.

. Edmond v. City of New Orleans, 20 F.3d 1170, 1994 WL 144782, at *2 (5th Cir.1994) (precedential under 5th Cir. R. 47.5.3); see also Bazan, 246 F.3d at 493 (holding that earlier events "set the stage for what followed,” and that factual disputes regarding those events were material).

. See, e.g., Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir.2002) ("[W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force.”); Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir.1995) ("The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants’ own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.” (footnote omitted)).

. 222 F.3d 1040, 1042-43 (8th Cir.2000).

. 5 F.3d 230, 235 (7th Cir.1993); see also Kirby v. Duva, 530 F.3d 475, 482 (6th Cir.2008) (“Where a police officer unreasonably places himself in harm’s way, his use of deadly force may be deemed excessive.”).

. 409 F.3d 689, 697 (6th Cir.2005).

. 942 F.2d 265, 268 (4th Cir.1991). Asido, the court concluded that "a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum.” Id.

. See Cole v. Carson, 802 F.3d 752, 760 (5th Cir.2015) ("[Tjhere is no open season on suspects with guns.”).

. See, e.g., Swindle v. Livingston Par. Sch. Bd., 655 F.3d 386, 402 (5th Cir.2011); Harper v. Harris County, 21 F.3d 597, 601 (5th Cir.1994) (per curiam) ("Of course, [the officer] still may assert qualified immunity at trial.'').